## LEVI v. KARRICK *et al.*

1. SETTLEMENT OF ACCOUNTS: RECEIPT. A receipt showing a settlement between the parties is *prima facie* evidence that they have adjusted all matters touching the business or adventure to which it relates; and until rebutted by showing that it was obtained by fraud, executed without proper knowledge of the facts, mistake or the like, is conclusive evidence of what it contains. And when the evidence supporting and impeaching such a receipt is balanced, the receipt must have its *prima facie* effect.

2. COMPENSATION OF COPARTNER. As a general rule, every copartner is bound to exercise due skill and diligence in promoting the interest of the copartnership, without reward or compensation, unless it be otherwise agreed between the parties; but such agreement may be implied from the course of business pursued between the copartners, as disclosed by the evidence; and when a partner renders services which neither the law nor the agreement of the parties imposes upon him, an agreement that he shall be paid is implied.

3. RECEIVER: RIGHTS OF THIRD PERSONS. It is competent for a court of chancery, by an interlocutory order, to take possession of property which is the subject of litigation pending the proceedings; but when the rights of third persons, in no manner parties to the suit, and who have purchased in good faith, have intervened, such power should not be exercised.

4. BAD FAITH OF COPARTNERS. A partner is required to exercise toward his copartners the utmost good faith in all matters relating to the copartnership, and if one deals with or uses firm property, he will be held to account for all profits arising from such use or transaction, and if loss arises from his fraud he is liable to his copartners for all injuries from such misconduct.

5. SAME: PLEADINGS. To entitle copartners in a suit to settle the business of the firm, to recover against a partner damages for the fraudulent use of firm property, the proper basis must be laid in the pleadings by allegations of the misappropriation complained of.

6. RULES FOR THE STATEMENT OF AN ACCOUNT. When a copartnership was formed for the purpose of working a mining interest in certain lots owned by the copartners, and each partner was to pay his equal proportion of the expenses according to his mining interests in said lots; and when the books of the copartnership were for a portion of the time in which the firm were engaged in mining, so kept that it was impossible to separate the expenses, it was held:

    1. That in stating the accounts for the term during which they were kept separately, each partner should be charged with his proportion of the expenses incurred in raising mineral on each lot.

    2. That in stating an account for the time during which they were not thus kept, the entire expense should be apportioned to each lot in proportion to the value of the mineral raised, and the copartners charged in the ratio of their interest in each lot.

*Appeal from Dubuque District Court.*

### WEDNESDAY, JUNE 11.

THIS case was before this court at the June Term, 1859. (8 Iowa, 150.) The bill was filed by Levi, in November, 1857, to dissolve and have settled a partnership formed between himself and the respondents, Karrick and Jones, in August, 1854. The partnership agreement was verbal, and the object was to work certain mining interests owned by the parties in mineral lots 264 and 265. They also had a mining interest in lot 268, known as "Carter's field," but as no mineral was raised from this, it may be dismissed without further notice.

Lot 264 was known as the "Starr lot," from which Karrick and Jones were to receive the ground rent, or one-fourth of the mineral raised, and in the working or mining interest, Levi owned eight-eighteenths, and Karrick and Jones, five-eighteenths each.

Lot 265 was known as the "Levi lot," and from this Levi was to receive a like ground rent, and one-sixth of the

mining interest, while Karrick was entitled to two-sixths, and Jones to three-sixths of that interest.

The lots were adjoining, and were worked by the parties until after the commencement of this suit. In this adventure, expenditures were incurred to the amount of near $65,000 exclusive of rent, while mineral was raised to the value of about $137,000. It is charged in the bill that "each partner was to pay his equal proportion according to his mining interest in said lots, of all expenses necessary to carry on said business of mining therein." This averment is not denied. But from the fact that large expenses were incurred in the purchase of gins, engines and other machinery, which were used in such a manner as to render it difficult, if not impossible, to tell whether such outlay should be charged to the one or the other of said lots, the parties disagreed, and hence the occasion of this litigation.

The cause before the former appeal had been referred, and was brought here to test the correctness of the finding of such referees. For the reason, among others, that the referees had adopted an improper rule in charging the expenses incurred in working these mines, the cause was reversed and remanded.

After this, in the court below, an order was made dissolving the partnership, appointing a receiver to take charge of the effects, and referring the case to a master in chancery, "to inquire and state all the facts and the testimony, also an account between the parties according to the decision of this court." On the coming in of this report, exceptions were filed which were overruled, and the master's action, after some amendments made by consent of parties, was in all respects confirmed. From these rulings respondents appeal.

*Thomas M. Monroe, S. F. Miller, Allison & Crane* and *Samuel Duncan* for the appellants.

*O'Neill* and *Harvey* for the appellee.

WRIGHT, J. — It is seldom that a case is brought before us, involving more difficult or intricate questions than the one now presented for our determination. These difficulties arise, not so much from the questions of law discussed by the counsel, as from the novelty of the controversy, the character of the agreement between the parties, the manner in which the accounts were kept, the mass of testimony, at times conflicting, and difficult to reconcile, and the course pursued by the parties in making their expenditures, and working their lots.

After listening to and reading the very full and able arguments of counsel, after patiently examining a most voluminous record, and the several statements of the account, as claimed by either party, we have arrived at certain conclusions, which must form the basis of a final settlement of their respective rights. 1. The second, third and fourth exceptions to the master's report, raise the question, whether he determined correctly in finding that there was no settlement between the parties, as charged by the respondents, on the 1st of November, 1855.

On the 24th of November, 1855, plaintiff executed this receipt:

"$392.67.                              *Dubuque, Nov.* 24, 1855.

"Received of Geo. Ord Karrick, superintendent of the diggings owned by Karrick, Levi & Jones, three hundred and ninety-two dollars and sixty-seven cents, in full settlement for my interest in said diggings to the 1st day of November, instant, as shown by account current rendered by said Karrick.                                    "A. LEVI."

It was agreed on the 29th of October, 1860, that a copy of this receipt should be used in evidence, with like effect as the original.

For several reasons we feel bound to conclude that the

master erred in stating the account for the period anterior to the 1st of November, 1855.

· The receipt is unambiguous · in its terms. It expressly acknowledges the receipt of so much money in full settlement of all that was due for his "interest in the diggings" to the date named. Its execution is not denied, but admitted. The familiar rule is not · controverted, that *prima facie*, this paper, like all others importing a settlement is evidence that the parties then adjusted all matters touching the business or adventure to which it relates. This is affirmative, and, until rebutted, conclusive evidence of what it contains. The burden is thus thrown upon the complainant, to impeach it, by showing that it was obtained by fraud, executed without proper knowledge of the facts, mistake, or the like. With him was the laboring oar, as to this issue, therefore. And so far from impeaching *it*, we think the evidence and circumstances clearly tend to maintain it.

In May, 1858, the referees made their report, which was before us when this case was heard on the prior appeal. It is found in this record, and they expressly state that there was a full settlement on this date, and that each of the copartners was paid his full share of the proceeds arising from · the copartnership business up to that time. And while complainant excepted to this report upon eight distinct grounds, he makes no objection to this finding, nor a suggestion, even, that it was erroneous. Then again, Karrick, who was the active partner in the firm, sets up this settlement in his answer, filed in February, 1858, and yet complainant made no effort by pleading, testimony or otherwise, to invalidate this receipt until the 30th of October, 1860, the day on which the master closed the testimony, and this he does by his own deposition. Giving to his testimony, however, all the weight that can be consistently claimed, it is fully met by that of Karrick on the

same subject, taken in September of that year. The evidence of Karrick is quite as clear, quite as reasonable, and quite as conclusive upon the point in controversy, as that of complainant. And if they stand equal, the receipt must have its *prima facie* effect. But without pursuing this subject further, it seems to us that this effort to avoid the force of this settlement, years after it was made at the close of the testimony, by the uncorroborated evidence of the party in interest, after there had been one report of a competent tribunal, unexcepted to, affirming its validity, has entirely failed, and that these exceptions to the master's report should have been sustained. With the account prior to the 1st of November, 1855, therefore, we have nothing to do, except as it may aid in determining matters arising subsequently.

2. The fifth exception is that the master erred in refusing to allow the respondent, Karrick, for his services as superintendent of said mining operations. Upon this subject the finding is, that he acted as superintendent during the greater portion of the time, that he devoted a considerable part of his time to their affairs during the early part of his superintendence, and all of it after that, that he did so without any agreement or understanding that he was to receive compensation therefor, and that he was not, therefore, entitled to pay for such services.

The general rule upon this subject, as stated by Judge STORY, is: "That as there is an implied obligation on every partner to exercise due diligence and skill, and to devote his services and labors for the promotion of the common benefit of the concern; it follows that he must do it without reward or compensation, unless it be expressly stipulated for between the partners, as it well may be under peculiar circumstances." This is a correct statement of the general rule where the partner is acting simply in the discharge of his duty as such partner, for while he is taking care of the joint

property, he is also attending to his own interest, performing duties implied in, and constituting a part, at least of the consideration for the others to engage in the partnership. "The law," says the same author, "never undertakes to measure and settle between partners the relative value of their various and unequal services, for the obvious reason that it is impossible to see how far in the original estimate of the parties, when the connection was formed, the relative experience, skill, ability, or even the known character and reputation of each entered into the adjustment of the terms thereof." (Part., § 182.)

This is the general rule, and the substance of the reasoning used to show its propriety. But like many general rules, experience has shown, by the application of the same reasoning, that it is not inflexible. That is to say, if an agreement that the partner shall be paid for his services can be fairly and justly implied from the course of business between the copartners, he is entitled to recover. The question is one of evidence, or contract, and whether the right to recover is established by necessary implication or from express stipulation, the rule is the same.

This rule is maintained by *Caldwell* v. *Lieber*, 7 Paige, 483, cited in the note to § 182, Story on Part. So in *Lewis* v. *Moffatt*, 11 Ill., 392, it is held that the firm may be liable when such an agreement may be implied from the course of the business between the partners, or from the nature of the services rendered, in connection with the duties and obligations imposed by the copartnership articles upon the several members of the firm, that there is no inflexible rule that one partner shall not recover for extraordinary and unusual services, without an express agreement to that effect.

Then, again, this rule is well settled: that if a member of the firm is employed to render services which neither the law, nor the agreement of the parties, impose upon him,

an agreement is implied that he shall be paid. And hence it was held in *Bradford* v. *Kimberly*, 3 John. Ch., 431, that: " Where the several owners meet, and constitute one of the concern an agent to do the whole business, a compensation is necessarily and equitably implied in such special agreement, and they are to be considered as dealing with a stranger." Following the same line of argument, Justice CATON, in *Lewis* v. *Moffat, supra*, says : " In this case, it is true, there was no express contract that Lewis should be paid for the services which he should render, but when he was expressly requested and employed to render those services, which he was under no more obligation to render than a stranger, and when he has devoted his time and talent to the business of the firm upon such request, it is but reasonable and just that he should be paid for his services."

Following the law as recognized by these cases, we think the master erred in refusing compensation to Karrick, for his services as superintendent. The testimony satisfies us that he acted as superintendent with the knowledge and consent of all the partners. The agency was one of hazard, and required a large amount of skill, and business capacity. The mines were, for a portion of the time, worked day and night, and he was frequently there at all hours of both. Upon him devolved the employment of a large number of hands. He superintended the books, (not, perhaps, in the most satisfactory manner,) the settlements with hands, and their payment, and had to supervise valuable machinery, and to look after the general interest of the partnership. In a word, we think it equitable and just, and entirely in accordance with the understanding of the parties, that he should be paid. The only matter to be determined, is the amount of that compensation. And, in fixing this, we are not to be governed alone by the opinion of witnesses. It is our duty to " look at the nature and character of the services rendered, the time employed, the skill and talent

exercised, and the benefits derived to the firm, and then, by exercising our own judgments, in connection with the judgments of others," come, as near as practicable, to a satisfactory conclusion.

Counsel claim for him $5 per day, for twenty-one months, or $3,150. Under the circumstances this is too much. He is, of course, entitled to nothing prior to November 1, 1855, the time of the settlement. For a portion of the time after that, until his superintendency ceased, (Aug. 1, 1857,) the work was not heavy, not such as to engage him constantly, as it did subsequently. A fair average compensation will be $75 per month, for the twenty-one months, amounting in the aggregate to $1,575.

3. After the appointment of the Receiver, respondents, upon a showing made, moved that he be directed to take charge of the property of the firm, composed of engines, gins, and other machinery used about such mining operations, and that he be authorized to lease or rent the same, and also to remove said Receiver, and appoint some suitable person in his place. By consent this application was referred to the master who overruled it, and the exception to this action is the next matter brought to our attention.

Under the circumstances disclosed, we conclude that this ruling was correct. No good reason is shown for the removal of Wood (the Receiver first appointed). And while, as to the other part of the motion, there was nothing in the state of the pleadings to prevent such an order, yet the fact that the property had passed into other hands, (and this fact is found by the master,) was a sufficient answer to the application. It is competent for a court of chancery, by an interlocutory order, to take possession of property which is the subject of litigation, pending the proceedings. If, however, the rights of third persons, in no manner parties to the record, have intervened; as in this case, if they have purchased the property in good faith, the Master or

Levi v. Karrick.

Chancellor will not exercise such a supervisory control as to order it into the possession of the Receiver. These purchasers have rights which cannot be adjudicated in this summary and collateral method.

But growing out of this question is another, urged with great persistency, and which is, in fact, of great importance to the parties.

Under a judgment, in favor of "The Bank of Auburn," against Karrick, Levi & Co., the property now under consideration was sold by the sheriff, and bought, as respondents claim, by the complainant, Levi, he paying for it, as they insist, in whole or in part, with the funds of the partnership. All this is denied in argument, by the complainant, he insisting that he bought it in good faith from the purchaser at such sale, and paid for it with his own means. The impression the testimony has made upon our minds, inclines us to believe that there was an understanding between Levi and the purchaser, at the sale, that complainant was to have the property by paying the amount of the bid, and the balance due on the judgment, which he subsequently did. It is left in much doubt, however, whether he used any other than his own means in making such payment. But whatever the facts may be, a difficulty meets us at the threshold, which first demands our attention.

It is true that each partner is required to exercise towards the other the utmost good faith in all matters relating to the copartnership. And if one deals with or uses the firm property, he should be held to account for all profits arising from such use or transaction. Not only so, but if loss arises by his fraud, he is liable to remunerate his copartners for all injuries arising from such misconduct. But it seems to us that to entitle the other partners to recover for such fraud, such failure to exercise good faith, such use of the joint property, there should be some predicate for it

in the pleadings. If these matters occur pending the action, then they should be presented to the court in the form of further, supplementary, amended or other pleadings. Until this is done, we are not aware of any rule which would justify the court in charging a party with the consequences of such fraud. In this case, however, there is no intimation anywhere, in any of the pleadings, that complainant had fraudulently converted the property to his own use, that he had used it for his own gain, or that he had exercised other than the utmost good faith in his connection with it. For his own protection, it was not necessary that complainant should have asserted his title in a supplemental bill, and thus had it adjudicated. The position of respondents is not that this property shall be surrendered up and treated as assets, (for having, as we have seen, passed into other hands, "The Julien Mining Co.," this cannot be done,) but that complainant shall be charged with its value, which they estimate at some fifteen thousand dollars. To charge him with its value, they must maintain that, as the trustee of the copartnership, he had no right to purchase it for his own use. If, however, he purchased from a third person, in good faith, he would be protected in his title, and not liable to account for its value. And this issue should have been made by the pleadings. Until there was some pleading, advising complainant that he was sought to be thus charged, he was not bound to defend, nor could he be made liable. And, therefore, while upon the question of fact, we should be inclined against complainant, as the record stands, we think the master did not err. And we feel less hesitation in thus concluding from the fact that while the point is argued by counsel, no specific exception was taken to the master's report, upon this ground, in the court below.

4. It is claimed that the master erred in the amount allowed Karrick and Jones as ground rent for mineral raised on the "Starr Lot," for the months of February and

March, 1858. This is a question of fact, to be determined from the testimony. An examination of this fails to satisfy us of the alleged mistake, and this is all we have to say upon this point.

5. But the question of greatest magnitude, and that upon which counsel have bestowed the most labor, still remains to be considered.

As to certain matters, there is no controversy. We can easily ascertain the amount of mineral raised on each lot, the price for which it was sold, the respective interest of each partner therein, the amount of rent paid, and the *aggregate* amount of expenses. But as the respective shares of the parties in these lots differed, it is a matter of vital importance to settle upon some just rule by which to apportion these expenses. Thus, to illustrate, as respondents were to pay five-sixths of the expenses of working the "Levi Lot" and but five-ninths of said expenses on the "Starr Lot," it is to their interest to charge as large a proportion of these expenses as possible to the "Starr Lot." And it is, in like manner, the interest of the complainant to make "Levi Lot" liable, so far as he can, because he thereby decreases the amount he would have to pay.

It will be remembered that the contract was, "that each partner was to pay his equal proportion, according to his mining interest in said lots, of all expenses necessary to carry on said business of mining thereon." When this cause was formerly before us, in giving a construction to this contract, we used this language: "The referees were bound by the agreement of partnership, in stating an account, to charge to each partner his proportion of the expenses in raising mineral on each lot, according to his interest in said lot. They have departed from this rule, in those instances in which, instead of ascertaining the actual expenses incurred upon each lot for a given period, they have apportioned the expenses between them in proportion

to the amount of mineral raised on each lot.  \* \* \* \*
We do not know that the rule adopted by the referees
affords any correct criterion for ascertaining the amount of
expenses to be charged to the separate lots, and, in the
absence of any agreement that such should be the rule, we
think it was their duty to ascertain the true amount of
expenses to be charged to each lot." And afterwards, in
speaking of certain machinery, purchased principally for
the " Starr Lot," but used for both, it is said : " The refe-
rees should have apportioned the expense of the machinery
and labor, to each lot, according *to the benefit or advantages*
accruing to each lot by the expenditure."

Then the testimony was not before us, and the difficul-
ties which now present themselves, in giving a practical
application of the rules stated, did not arise. That the
views then expressed are correct, we entertain no doubt.
Whenever the expenses on one lot can be ascertained,
separate from the other, then it is perfectly clear that the
parties should pay them in proportion to their respective
interests. In such a case the matter should be treated just
as if the other lot did not belong to them. And it was
upon the supposition that these expenses could be thus
ascertained, and charged to each lot, that this rule was
given for their apportionment. It has been made perfectly
apparent, however, since the parties have exhausted all
the channels of evidence within their reach, that these
expenses cannot be thus divided. The very nature and
character of the business transacted, now that it is all before
us, suggests the difficulty. These lots were contiguous.
The lode was worked from east to west, passing first through
the " Levi," and then into the " Starr Lot." For some
months, a large amount of mineral, found on the " Starr
Lot," was carried back along the drift on the " Levi Lot,"
and thence lifted through a shaft which had been previously
sunk on the last lot, for the purpose of working out the

mineral found on that lot alone. This was found inconvenient, and as the owner of the "Starr Lot" would not permit them to sink a shaft thereon, they determined to sink one immediately upon the line between the two, and thus shorten the length of the drift along which they had to carry the mineral. After this, they had to deepen the drift, in order to carry off the water, and, in doing this, mineral was struck on the "Levi Lot," which, for some time, had been yielding but little. And, in doing most of the work, and all of that involving the heaviest expenditure, the parties had to use the same hands, horses and machinery; and it must be manifest to the plainest comprehension that it would be next to impossible. for any superintendent or book-keeper to tell, each month, just what proportion of this labor and expense was expended upon each lot.

It was the custom of the superintendent to close his accounts each month. And whenever the expenses were incurred exclusively upon one lot, he so stated. And in these instances we have no difficulty. The master apportioned the expenses for these months, according to the interest of each partner in such lot. And thus far, the parties agree. When this could not be done, he divided the expenses equally between the two lots, and made each partner pay the same, according to his respective interest, which he regarded, to use his own language, " as the nearest approximation that can be made to the directions of the Supreme Court, in the dim light of the evidence as to the expenses on each lot, in some instances, and its total absence in others."

Respondents object to this rule, and suggest two others. The first is : To apportion the entire expenses of the work upon each lot in proportion to the amount of mineral raised, and then charge the parties in the ratio of their interest in the respective lots. The second is : To charge

the vast bulk of the expenses, all except what are incident to the mere raising of the lead from the "Levi Lot," to the "Starr Lot," and to the parties in the proportion of their interest in that lot.

If respondents' assumption, that these expenses were incurred for the purpose of raising mineral from the "Starr Lot," and with the understanding between the parties that they should be paid for in the ratio of their working interest therein, was sustained by the evidence, the rule would be unquestionably correct. For this would be in perfect harmony with the spirit of their contract, and the rule followed in those cases where the expenses were kept separate. And yet the *object* for which the machinery was purchased, is not alone a safe criterion, for though designed to assist in raising mineral from one lot, if it was used upon the other, that other, in the absence of agreement, should bear its due proportion of the expense. Not only so, but under the evidence submitted, the rule is not, in our view, practicable. The work upon the two lots was so intimately connected, that it is impossible to tell, with any fair approximation to certainty, what was the principal, and what the incidental, use of the machinery. Abstractly, the rule is correct, but it cannot be applied to the actual facts, as developed by the testimony.

Nor do we think the rule adopted by the referee correct. True, it is susceptible of a practical application, but it seems to us inequitable and unjust. According to this, it makes no difference how great the disproportion between the mineral raised upon the one lot as compared with the other, or how little the benefit or advantage in one case, or how great in the other, the entire amount is divided, and the parties required to pay each half according to his working or mining interest. Thus, assuming that the aggregate expenses were $65,000, the rule makes the "Levi Lot" pay one half of it, or $32,500. But the mineral raised

from this lot was, say $15,000, while that raised from the "Starr Lot" was over $120,000. Now, while respondents were entitled to five-sixths of this $15,000, they would, under this rule, have to pay the same proportion, or five-sixths of one-half of the entire expenses, or about $27,000. And, on the other hand, while complainant would get four-ninths of the $120,000, or say $53,000, he would pay but four-ninths of the estimated expenses, or say $14,500. Of course, in this statement, we do not pretend to critical accuracy, for, to say nothing more, there would of course have to be excluded those months, or the time, when the books showed that the expenses were kept separate. We merely use these figures to show that, as a rule, it cannot be correct. Nor does it accord with the spirit of the rule, as heretofore given by this court. For, in the absence of testimony as to the lot upon which the expenses were actually incurred, it ignores the idea that they should be apportioned " according to the benefit or advantage accruing to each lot by the expenditure."

We then come to the rule which, in those cases where the expenses were not kept separate, apportions the entire amount upon each lot in proportion to the value of mineral raised, and charges the parties in the ratio of their interest in each lot. This rule may not be in all cases just, but it recommends itself as more nearly so than either of the others, under the circumstances. It is simple, and of easy application. And we do not see why it will not be substantially just and equitable. It certainly has the merit of requiring the parties to pay for the benefits derived, in proportion to their interest therein. It treats the operations upon each lot as a distinct adventure, and by approximating the expenses as near as possible under the confused manner in which the accounts were kept, makes the parties share the expenditure in the ratio of their receipts.

And here speaking of the manner in which the accounts were kept, about which much has been said by counsel, we deem it proper to say that we see no reason for making Karrick or either of the respondents liable for any neglect in this respect. There is no evidence to satisfy us that they were guilty of fraud, or that they had any sinister motive. It is possible that they might have been kept more intelligibly. And yet, under all the circumstances, it was nearly, if not quite, impossible to keep the expenses on the two lots distinct. In the absence of some fraudulent purpose, we do not think they should suffer by having applied an onerous or inequitable rule, in the settlement of a partnership, which was entered into in the most friendly manner, but which has been dissolved only after a most protracted and bitter litigation.

The case will be referred to a master, to state the account in accordance with this opinion, that a final decree may be entered in this court. The question of costs, and all others not herein disposed of, will be reserved until that time.

The cause was referred to THOMAS F. WITHROW, as master, and upon the filing of his report a decree was entered in this court. The complainant and appellee, Levi, and the respondent and appellant, Waters, filed petitions for a re-hearing. In overruling the applications the following opinion was delivered by:

WRIGHT, J.—Since the filing of the foregoing opinion, Levi and Waters have, by their counsel, presented for our consideration elaborate arguments for a re-hearing, and have urged, with much zeal and apparent plausibility, that injustice has been done them in the rulings made, the report of the master, and the decree founded thereon.

While we continue of the opinion that we have enunciated the law correctly, as applied to the facts of this case, the magnitude of the cause, and the great research shown by counsel in presenting it for our consideration, perhaps demand that we should briefly state our reasons for refusing their application.

And *first*, as to the settlement of November 24, 1855. As to this, we deem it unnecessary to restate the considerations which induced us to hold that there was not sufficient testimony to impeach the *prima facie* effect of the receipt of that date. But we may notice a point now presented by counsel, which was not urged, or if so, not much relied upon in the first argument. It is asked: "Of what is this receipt a settlement? To whom is it a settlement? Not with Jones, for he is no party to it. It is between his two partners—not signed by him, or under his control, or agreement. Jones is clearly not estopped by it. But if Jones is not, then Levi is not. Estoppels are odious in law, and, to be binding, must be mutual." These inquiries, and this reasoning, misapprehend the language of the receipt, as well as the effect given to it. Thus it must be borne in mind, that Karrick, who paid the money to Levi, and took the receipt, was the superintendent of the diggings worked by the parties. He was the agent of the partnership—received all money arising from the sale of mineral, and paid it out to the partners or other persons entitled to the same. The receipt is to him: "in full settlement for my (Levi's) interest in the diggings." This language is fairly susceptible of but one construction, and that is, that Levi admitted that he had received all that was coming to him to that date, from the proceeds arising from the working of the mines. It was not conclusive upon him, and we never have so held. Nor was it more binding upon Jones. But it does show *prima facie* that this much was owing to Levi, and no more. And to this extent would Jones be

bound by the action or settlement made by Karrick, as the agent of the firm. And as Jones might impeach it, so might Levi. The effort was made, but unsuccessfully—and therefore, we gave it before as we do now, its *prima facie* effect.

Next, as to the amount allowed Karrick for his services as superintendent. If, under the testimony, and the rules of law governing, he is to be allowed anything, we are satisfied that his compensation has not been fixed too high. We do not understand the principles of law, declared by us upon this part of the case, to be controverted ; but the claim is, that $75 per month, under the circumstances, is extravagant. If governed alone by the opinion of witnesses as to the value of these services, we should certainly have allowed more than this amount. We determined, however, that we were not to be governed alone by these opinions. We exercised our own judgments, in connection with these opinions, to arrive at a conclusion as nearly satisfactory as practicable. We could not interfere with this finding without coming in conflict with the great body of the testimony on this subject, and losing sight of the hazard incurred, and skill requisite in superintending the large business carried on by these partners.

But it is, in the *third* place, claimed that an incorrect rule was adopted, in apportioning the expenses incurred in raising mineral from these lots. And it is now insisted that, by the terms of the partnership, these expenses should be apportioned to the several partners according to their interest in *both* lots, and not their interest in *each* lot. In other words the position is, that Jones should pay fourteen thirty-sixths, and Karrick and Levi eleven thirty-sixths each, of the *entire expenses*, instead of apportioning them on each lot in proportion to their interest in each, or the amount of mineral raised from them severally. This rule is condemned by the construction given to the contract by

the parties themselves, for, so far as the expenses were or apparently could be kept separately, they were so charged, and each lot was made to pay the expenses incurred thereon, in proportion to the interest of each partner therein. It was only after the work was so carried on that this could not be done, that this view or construction of the contract was departed from. And then, without pretending to apportion the expenses, they were charged generally, without any apparent intention of determining how they should be finally divided. Then, again, this contract received a contrary construction, after the most careful consideration, when the case was first before us in 1859. 8 Iowa, 150. For it is there expressly stated that " the referees were bound, by the agreement of partnership, in stating an account between the parties, to charge to each partner his proportion of the expenses in raising mineral *on each lot according to his interest in said lot.*" The argument against a division of the expenses, according to some rule, has not in all this protracted litigation, been before urged upon our attention, and we are not prepared, in the face of the action of the partners themselves, and the construction given to the contract on two occasions, after elaborate argument, to change our ruling.

*Fourth.* It is claimed by Waters that he was not owing Levi, Karrick & Jones anything, and that the sum of $985.99, found against him by the master, is grossly unjust and inequitable. In support of this position, he now produces the affidavit of Karrick, the superintendent, and one of the partners. It may be unfortunate for him that this testimony (for it is nothing else), was not introduced in the District Court. We are not prepared, however, to recognize the right of a party to make out his case, after it has been appealed to and determined in this court. This cause has been pending since 1857. Waters knew before, as well as since, the determination of the cause, that Karrick proba-

bly knew whether he was indebted to the firm.   If he did
not obtain his testimony in time to avail him, and injustice
has been done, he must suffer the consequences.   If Kar-
rick and Jones, or either of them, are of the opinion that
Waters should not be charged with this sum, then, as a
certain proportion of it is decreed to each, they can release
him *pro tanto* from his liability.   From the testimony sub-
mitted, and legitimately before us, the decree in this respect
we regard correct.

A great many alleged errors are pointed out in the
report of the master, in stating the account, under the rules
established by the former opinion.   And in this connection
it is urged, as a cause for rehearing, that petitioners were
not present when this report was presented and had no
opportunity to take exceptions to it.   To this the reply is,
that it was expressly requested by all parties, when the
cause was submitted, that a final decree should be rendered
in this court.   The opinion was announced near three
weeks before the entry of the final decree.   All parties
were notified of the result, advised that a master had been
appointed, who would report at the same term, and had
ample opportunity to be heard, if they so desired.   We
need only say, that if a party has had an opportunity to be
heard, and fails to avail himself of it without good excuse,
he cannot be permitted to urge his own laches, as a reason
for a further hearing.

As to the alleged errors, we remark, that we have with
the assistance of a most able and experienced accountant,
re-examined the report, and find that it is not subject to
the objections urged.   The case is peculiarly complicated.
It is only after the most patient examination of the
immense mass of testimony, that anything like satisfactory
results can be arrived at.   If critical or mathematical accu-
racy has not been reached, it must be attributed to the
character of the adventure entered into by these parties,

and their method of conducting the 'same, and certainly not to a failure on the part of counsel to faithfully and ably present the cause of their respective clients. We have met with difficulties at every step. In their solution, we have given the case our most laborious attention. And believing that further argument and investigation would not change the results, as heretofore announced, we are constrained to refuse these applications.