J. R. SMITH, Appellee, v. W. C. SMITH, Appellant.

PARTNERSHIP: The Relation—Subject Matter. Principle recognized that a partnership, originally so organized as to embrace one venture only, may be expanded by *mutual acquiescence* so as to embrace any manner of business that would make a profit.

PARTNERSHIP: The Relation—Evidence as Between Partners. Partners may, by long continued practice, conclusively demonstrate that thèir real partnership agreement was that the *services, income* and *expense* of one should balance the services, income and expense of the other, *even though there were inequalities therein.* So held where neither partner, for 27 years, was charged with any amount withdrawn nor credited with any amount deposited.

DEEDS: Presumption of Title—Evidence to Overcome. Principle recognized that a presumption of ownership follows the legal title, and that the evidence to overcome such presumption must be clear, satisfactory and unequivocal.

TRUSTS: Resulting Trusts—Parol Evidence to Establish. A resulting trust may be established by parol evidence.

PARTNERSHIP: Firm Property—Purchase of Lands With Title Taken Individually—Resulting Trust. A resulting trust may

be implied from the fact that partnership funds are employed in the purchase of lands and title taken in the name of an individual.

**PARTNERSHIP:** Firm Property—Partnership Real Estate. Principle recognized that lands held by a partnership are to be treated as personalty, in so far, at least, as necessary to meet partnership obligations or to pay any balance owed to one partner upon settlement of the partnership affairs.

**TRUSTS:** Resulting Trusts—Partnership Funds in Lands With Title in Individual. The same evidence which will make lands partnership property for the purpose of paying debts and adjusting the equities between the partners, will establish it as such for the purpose of final division.

**TRUSTS:** Resulting Trusts—Element of Fraud—Partnership. Bad faith or fraud is not essential to the establishment, in favor of a partnership, of a resulting trust in lands.

**PARTNERSHIP:** Firm Property—Partnership Funds Employed for Private Purpose—Effect. Lands purchased and improved by one partner with partnership funds, and used thereafter for a long series of years *solely for family purposes*, all with the knowledge of the other partner, will not be treated as partnership property, no rights of creditors being involved; but the purchaser will be charged·for the amount paid therefor. (This holding, under an unusual arrangement, by which the services, expenses and income of one partner were to balance the services, expenses and income of the other partner.)

**PARTNERSHIP:** Firm Property—Real Estate—Ownership—Intention of Partners. Record reviewed, and *held* that certain land transactions and the profits derived therefrom should be treated as partnership property, even though the individual property of one of the partners was *invested* in the initial transaction; likewise, that other lands purchased by one partner with partnership funds should, as between the partners, and in keeping with the intentions of the partners, be treated as .the individual property of the one purchasing.

**RECEIVERS:** Appointment — Jurisdiction — Partnership Matters. No receiver should be appointed in an action to settle the division of partnership property when the rights of creditors are not involved, and both partners are acting in good faith and are solvent.

*Appeal from Wright District Court.—C. G. LEE, Judge.*

. SATURDAY, DECEMBER 16, 1916.

REHEARING DENIED SATURDAY, MAY 19, 1917.

SUIT for an accounting between the parties and to set-
tle the title to lands acquired by each. On hearing, de-
cree was entered, from which both parties appeal, that of
defendant being first perfected.—*Modified and Remanded.*

*Wesley Martin* and *McGrath & Archerd,* for appellant.

*Sylvester Flynn* and *Nagle & Nagle,* for appellee.

LADD, J.—The parties to this suit are
**1. PARTNERSHIP:** brothers. When the case was heard in the
**the relation:**
**subject-** district court, plaintiff was 76, and defend-
**matter.**
ant 71 years of age. They entered into
partnership in 1881. The terms thereof are in dispute. The
plaintiff, to whom we shall hereafter refer as "J. R.," tes-
tified:

"I told W. C. that I thought I ought to go into the
cattle business on my own hook. I always made more
money when I was alone; but he said, 'Two can handle
cattle on these prairies to advantage, and we had better go
in partnership;' and we agreed to go in partnership and
buy a bunch of cattle and go upon the prairie."

The defendant, to whom we shall hereafter refer as
"W. C.," gave a somewhat different version, by testifying
that J. R. "spoke of about $2,000, the amount of money
that he would put into the cattle business that summer. In
our conversation as to the $2,000 he was to put in, we were
to go into a general partnership and deal in any manner of
business that would make us a profit."

This appears to have been the only conversation they
had on the subject, and, though the agreement was want-

ing in details, especially relating to what each should in-
vest, and the sharing of profits and losses, they did busi-
ness as a copartnership for 27 years. The firm engaged in
numerous ventures, thereby strongly confirming the testi-
mony of W. C. that the partnership was general and to deal
in any manner of business that would make a profit. J. R.
has testified as though the partnership ended with each
venture, and has computed largely from memory the profits
or losses in each; but the record leaves no doubt that it was
continuous, and that, though memoranda of some trans-
actions may have been kept after 1890 by the individual
members of the firm, no accounts were ever kept by the
firm, and the only records of its business transactions were
those of the banks where its business was transacted. Each
withdrew for expenses whatever he chose, without having
the same charged to him. Each treated the other with the
most implicit confidence, and was left free to transact any
business undertaken according to his individual judgment.
During the 27 years, no settlement or division of property
was had, save as this may be inferred from circumstances
hereafter to be considered, and all moneys, from whatever
source received by firm or individual, were deposited to the
firm's credit, after an account was opened at a bank in
1883, and all moneys for whatever purpose were drawn
therefrom. The business was done largely on borrowed
capital, notes for which usually were signed by Smith Bros.,
but frequently by one of them only, and the interest and
the principal when paid were taken from the firm funds.

In 1881, when the partnership agreement was entered
into, J. R. had $2,000, and had borrowed $500, which sub-
sequently was paid from the funds of the firm. W. C. had
$8,375, 320 acres of land, and some lots in Des Moines. All
this money, with enough borrowed to make $16,000, was in-
vested in cattle, which were pastured on the then unculti-
vated prairies of the state. The firm dealt in cattle until

1888. Later on, it engaged in buying and selling hogs for about 6 months. In connection with others, it bought, picked and shipped a carload of chickens. It bought and shipped to New York several carloads of horses. W. C. managed a lumber yard for about 2 years, at a salary of $75 per month, which he deposited in the bank to the firm's credit. In 1886, J. R. bought 20 shares of capital stock in the First National Bank of Eagle Grove, and W. C., 30 shares. Four years and a month later, the charter of this bank was surrendered and the Citizens State Bank organized, J. R. receiving for his stock $3,200 in stock of the latter, and W. C., $4,800 in said stock. Shortly afterwards, in 1890, each acquired enough stock to increase his holdings to $6,000, and J. R. was elected cashier thereof and served as such 13½ years. In the fall of the same year, the firm purchased a grain elevator, and improved it so that its cost was $3,500. It was operated 12 years by W. C. for the firm, and then sold for $5,000. All the bank stock was paid for out of the firm account, and all dividends declared, the salary of J. R. during 13½ years, and the amount paid him for services in liquidating the assets, were entered to the firm's credit. The grain business was done in the name of Smith Bros., and money taken from its funds for its operation, and receipts entered to its credit. Even when J. R. was representative, and W. C. senator, in the General Assembly, the salaries received over expenses were deposited in the firm's account. From this outline, it is apparent that the scope of the partnership, even though limited originally as claimed by J. R., changed as the years passed, so as to include enterprises other than dealing in cattle, and doubtless not originally contemplated. That the scope of partnership may be thus expanded by mutual assent of the members is beyond question. Any business that they might have agreed that the copartnership engage in originally could be taken on thereafter, and doing so may be

evidenced as originally by written or oral agreement, or implied from the conduct of the parties and what was done by the firm. *England v. Curling*, 8 Beav. 129; 30 Cyc. 363; *Buffum v. Buffum*, 49 Me. 108 (77 Am. Dec. 249); *Sullivan v. Sullivan*, 122 Wis. 326 (99 N. W. 1022); *Sanger v. French*, 157 N. Y. 213 (51 N. E. 979).

2. PARTNERSHIP:
the relation:
evidence as
between part-
ners.

The scope of the partnership was changed and expanded by mutual acquiescence and assent so as to include the different enterprises enumerated. Any other inference is entirely inconsistent with the record, and we have no doubt as to the continued existence of the copartnership, and that each member faithfully devoted thereto all his property and services for the period of 27 years. The only inference to be drawn from what was actually done is that the services of one party were to be offset against those of the other, and their respective individual incomes and expenses were to be treated the same way. While W. C. had put most into the firm, it is likely that his expenses were somewhat greater than those of J. R., because of having a family. For all that appears, there may have been other inequalities; but whether there were or not, these men had the right to enter into such an arrangement as prevailed during the long period of their association, and we think that their practice for more than 27 years, during which time no charge for expenses to the one withdrawing funds from the common funds, and no credit for the income to the one depositing the same were made, warrants the conclusion that such was their understanding of the relationship assumed between them. Moreover, it would be exceedingly difficult, from the imperfect data to be derived from the memories of the parties, the bank accounts, and any memoranda kept by either or both of them, to state an account at all reliable, and we are inclined to regard the result attained by practice of the parties, evidencing the sincerest reciprocal con-

fidence, as more reliable and more equitable than any com-
putation which might be made from the evidence before us.
All partnership business other than the payment of the
partnership notes, and any moneys to the firm's credit with
the bank, other than that in connection with lands, was
closed before 1904. Did the partnership engage in buying,
holding and selling land? Notwithstanding the fact that
all business other than this terminated in the year just
mentioned, the firm continued its account at the bank as
before, and both deposited and withdrew funds as before
until 1909, and J. R., nearly 2 years thereafter. No settle-
ment was then made nor the firm obligations met. The rec-
ord discloses that the business up to that time had not
been done at a loss. Each then had a well improved farm
near Eagle Grove, representing their accumulations, and the
obligations of the firm then equalled, if they did not ex-
ceed, the moneys invested in other lands. Why was the
business continued in the same way it had previously been
transacted if it had not merely changed to dealing in lands,
as it had previously changed from one enterprise to an-
other? Partnership funds were employed to buy, expenses
for improvements and taxes were taken therefrom and rents
deposited therein and individual expenses paid therefrom,
precisely as before. That the partnership continued until
1909 at least, and that both parties so understood, is put
beyond all question by this record.

II. At the beginning of this suit, no personal property
remained in possession of the partnership. Its outstanding
obligations amounted to about $50,000, not to mention about
$13,000 paid by W. C. No real estate stood in the name of
the firm, but a large acreage had been purchased in the
name of each from the firm funds, as seen, acquired by the
use of the credit of the firm. The main inquiry is: Are
any of these lands property of the copartnership, and if so,
what?

In the absence of evidence indicating an

**3. DEEDS: presumption of title: evidence to overcome.**

intention to the contrary, a presumption of ownership follows the legal title. To overcome this presumption, and warrant the inference that title in the individual partner is held in trust for the firm, the evidence must be clear, satisfactory and unequivocal. *Noel v. Noel,* 1 Iowa 423; *Sunderland v. Sunderland,* 19 Iowa 325; *Childs v. Griswold,* 19 Iowa 362; *MacGregor v. Gardner,* 14 Iowa 326; *Burns v. Byrne,* 45. Iowa 285.

Such implied or resulting trust may be

**4. TRUSTS: resulting trusts: parol evidence to establish.**

established by parol evidence. *Bryant v. Hendricks,* 5 Iowa 256; *Nelson v. Worrall,* 20 Iowa 469; *Burden v. Sheridan,* 36 Iowa 125; *Amidon v. Snouffer,* 139 Iowa 159.

Proof that the realty in question was purchased with partnership funds and title taken in the name of an individual partner, without more, is said, in *City of Providence v. Bullock,* 14 R. I. 353, and *Philips v. Crammond,* 2 Wash. C. C. 441 (Fed. Cas. No. 11092), to be prima-facie evidence of an intention to treat the property purchased as copartnership property, and, in *McKinnon v. McKinnon,* 56 Fed. 409, to be a single persuasive circumstance indicating such intention.

A copartnership is a separate and dis-

**5. PARTNERSHIP: firm property: purchase of lands with title taken individually: resulting trust.**

tinct legal entity. *Newman v. Eldridge,* (La.) 31 So. 688. See *Schoonover v. Osborne,* 108 Iowa 453. And when its funds are paid for land, and title taken in the name of an individual, a resulting trust is to be implied, precisely as when one individual pays the purchase price and another takes title to the real estate bought. See cases cited, and *Lutz v. Billick,* 172 Iowa 543; *Levi v. Karrick,* 13 Iowa 344; *Paige v. Paige,* 71 Iowa 318; Lindley on Partnership (8th Ed.), p. 386; 1 Perry on

Trusts (6th Ed.), Sec. 127; *Forster v. Hale,* 5 Ves. 308.

But, as said in several cases, the infer-

**6. PARTNERSHIP:** ence to be drawn therefrom is of slight
firm prop-
erty: part- weight, because of the way real estate be-
nership real
estate. longing to a partnership is regarded. The

authorities in this country, as well as Eng-
land, agree that real estate, upon being acquired by a co-
partnership, is to be treated as having been converted into
personalty, to the extent that it may be required
to meet partnership obligations and to pay any
balance owed to one partner by the other in the set-
tlement of its affairs, but as to what remains thereafter,
opinions differ radically. In *Thornton v. Dixon,* 3 Bro. Ch.
*199, Lord Thurlow decided that real estate remaining at
the termination of the partnership was to be treated as real
estate, and would descend to the heirs; and this is the doc-
trine quite generally announced in this country. The de-
cisions are collected in notes to *Johnson v. Hogan,* (Mich.)
37 L. R. A. (N. S.) 889; *Robinson Bank v. Miller,* 27 L. R.
A. 449 (Ill.); *Goldthwaite v. Janney,* (Ala.) 48 Am. St. 56,
62.

Later, in *Townsend v. Devaynes,* 1 Mont. on Part., Note
2, App. 96, Lord Eldon expressed the view, overruling prior
decisions, that real estate belonging to a firm, unless the
partnership contained articles with different directions,
is to be considered personal property, and pass to the per-
sonal representative of a deceased partner interested there-
in, and such has been the law of England since. *Buchan v.
Sumner,* 47 Am. Dec. 305.

Because of such equitable conversion's

**7. TRUSTS: re-** being effected upon the acquirement of real-
sulting trusts:
partnership ty by a copartnership, cases are not wanting
funds in lands
with title in which over-emphasize the degree of proof es-
individual.
sential to establishing an implied or result-
ing trust in its favor in land, title to which has been taken
in the name of a partner. The same evidence which would

make land partnership property for the purpose of paying debts and adjusting the equities between the partners, however, would establish it as such for the purpose of final division; and in either event, all essential is that the evidence be sufficient to clearly and unequivocally establish the fact. *Fairchild v. Fairchild,* 64 N. Y. 471.

8. TRUSTS: re-
sulting trusts:
element of
fraud:
partnership.

Counsel for plaintiff argue that a finding of bad faith or fraud is essential to the establishment of a resulting trust. Such is not the law. On the contrary, the courts uniformly declare that whether real estate purchases with partnership funds shall be treated as partnership property depends on the intention of the partners, and whenever this can be ascertained, that intention will be given effect. *Johnson v. Hogan,* (Mich.) 37 L. R. A. (N. S.) 889, and note in which decisions are collected. Such intention may be manifested by surrounding circumstances, the situation of the parties, the manner of keeping the accounts, how repairs, improvements and taxes have been paid, and what has been done with the income—the use made thereof, and the like. Every case necessarily depends on its own peculiar facts, and not much aid may be had from the decisions, save by way of analogy.

9. PARTNERSHIP:
firm prop-
erty: partner-
ship funds
employed for
private pur-
pose:
effect.

III. Prior to entering into the partnership, W. C. had bought 320 acres of land near Eagle Grove. Subsequently thereto, he purchased three tracts contiguous thereto, paying therefor $2,560 from the firm funds. The expenses of improving the farm and paying taxes were taken from the same source, and the income deposited as a part of the firm funds until 1909. That this farm of 560 acres is the individual property of W. C. is not questioned. In 1893, W. C. bought Lots 11 and 12 in Block 43 of Eagle Grove for $2,150, and expended thereon for improvements, $2,250. These amounts were taken from

partnership funds. Since then, he has occupied it with his family exclusively. The partnership has received no benefit whatever therefrom. The only circumstance indicating a firm interest therein is the continued payment of taxes levied thereon, and for any repairs; but even this was not inconsistent with individual ownership, under their method of doing business. J. R. must have known of the withdrawal of the money, the purchase of the home, that W. C. intended the property for himself alone, and have acquiesced therein. We are of opinion that, as between them, the claims of creditors not being involved, the property should be regarded as that of W. C., and a charge to him made of the sum paid therefor.

10. Partnership: firm property: real estate: ownership: intention of partners.

In March, 1893, W. C. exchanged the Des Moines lots owned by him prior to 1881, for 320 acres of land in Hancock County, subject to mortgages with interest and taxes amounting to $5,000, and paid $1,000 difference from Smith Bros.' funds. The lots were estimated at $5,000. The income from this land, during the three years following, about equalled the taxes, interest, insurance and cost of improvements, and it was then sold, subject to the mortgages, for $6,000. This was deposited to the credit of the firm. Some days later, he acquired a farm in Humboldt County for the consideration of $5,850, but lots acquired at a cost of $450 or $500 from firm funds were computed as part payment, at $1,200. A mortgage of $2,500 thereon was assumed, and also a judgment lien, accrued interest and taxes, amounting to $558.-53. Debts of vendor amounting to $419.76 were paid, and a note for $230 to Verne Smith and one for $551.79 to the vendor given, and $500 paid in cash. Only $919.76 in cash was paid from the firm funds then, but the notes, judgment, interest, taxes and mortgages were paid therefrom during several years following. Nothing in the record tends to

show a purpose to reinvest the specific moneys acquired for the Des Moines lots. The proceeds of the same, like those derived from the sale of other lands hereinafter referred to, went into the firm account. This land was retained 13 years. It was improved from the firm funds and taxes and interest paid therefrom, and rents and profits deposited therein. It was treated precisely as if it were partnership property, like other property claimed by W. C. to belong to the partnership, and no charges to W. C. made nor credits given him; and we are of opinion, for the reasons hereinafter stated, that, notwithstanding the fact that title was taken in the name of W. C., it should be regarded as belonging to the firm. This land was sold in 1909 or 1910 for $14,400, and this amount appropriated by W. C. to his own use. He bought other land with part of it; but, as partnership transactions had then ceased, and he evidently thereafter was acting for himself, he should be charged therewith rather than it and the profits derived from subsequent investments.

In 1902, W. C. acquired in his name two half sections of land in Griggs County, N. D., at a cost to the firm of $11,000; and in 1906, another half section in the same county, at a net cost to the firm of $5,620. The last mentioned tract has been sold, since the last trial, for $12,800, of which only $2,000 was paid in cash. In 1905, he acquired a half section in Polk County, Minnesota. In 1907, he purchased a half section in Bottineau County. A quarter section acquired with partnership funds was exchanged for another quarter section in Bottineau County, North Dakota, W. C. receiving $1,000 as difference, which he retains. As defendant conceded all these lands to be partnership property, there is no occasion for entering further into detail. In 1912, W. C. exchanged the Minnesota land for the NE ¼ of Section 7 and the SE ¼ of Section 6, Township 160 N., Range 80, in Bottineau County, North Dakota, subject to

an incumbrance of about $8,000, and took back a mortgage of $4,500 on the Minnesota land. This latter mortgage has since been foreclosed, and a sheriff's deed taken by W. C. As we understand it, he has paid the incumbrance on the two quarters described, and made improvements, amounting in all to $9,000, out of his individual funds. As the deal was made with copartnership land, we think this land rightly held to be the property of the firm. Aside from this, there are two lots in Eagle Grove, other than his homestead, in his name, which belong to the firm.

In the fall of 1881, J. R. bought 320 acres near Eagle Grove for $3,200, paying therefor from the undivided proceeds of the sale of cattle belonging to the firm, and also $40 for expenses in making the purchase. In 1884, he added an adjoining 40 acres, at a cost of $400, and $30 expenses in perfecting the title. This land was improved and the taxes paid from partnership money, and all the income therefrom was deposited to the credit of the firm until December, 1910. The evidence shows that he talked with W. C. about buying this land, in order that he might have a farm of his own, and that W. C. advised him to purchase it. He lived there much of his time in the years shortly after acquiring it, as did W. C. on his farm near by, and each has uniformly referred to this farm as being J. R.'s. We are of opinion that the partners intended that it should be held by him individually.

In 1897, J. R. purchased 118.77 acres of land in Mississippi for $828 from the firm funds. A 240-acre tract was bought in the same locality in 1901, at a cost of $1,000. These sums, as well as the taxes and cost of improvements since, were taken from the firm funds, and the income deposited to the firm's credit. He passed two winters in the South, incidentally looking after these lands, and, aside from the circumstances related, nothing appears in the record to indicate that this was not a partnership transaction,

save the testimony of J. R. that he intended it for himself, and that W. C. knew it. In 1902, he purchased a section in Mercer County, North Dakota, for $1,500, and during the same year, exchanged store buildings in Eagle Grove, acquired with firm funds, of the estimated value of $3,300, for a section of land in Greggs County of the same state, subject to a mortgage of $4,000, paying another $4,000 difference. The cash payment was withdrawn from partnership funds, and the mortgage subsequently paid therefrom.

V. Ten sections of land in Saskatchewan, Canada, were purchased through negotiations by W. C., and by agreement, the agent divided these, and title to five sections was taken in each. Having themselves agreed on a division, even though paid for from firm moneys, and to whom each section should be conveyed, the intention that each should take as his own is manifest. These lands cannot be regarded as partnership property.

VI. As already indicated, we are inclined to regard the lands in Mississippi, North Dakota and Minnesota, as well as what is known as the Humboldt County farm, and the two lots, as partnership property. There are several reasons for so doing. (a) The partnership had dealt in land prior to the discontinuance of other business, some time in 1903. In 1893, J. R. purchased 80 acres of one Newcomb for $1,100, took the deed in the name of both, paid therefor from the funds of the firm, and, after retaining it several years, sold it at an advance of $1,878, the rents in the meantime exceeding the expenses in the way of improvements and taxes. In 1900, a farm of 140 acres of land was purchased by W. C. for $4,951, and title taken in his own name. It was sold, shortly afterwards, at an advance of $1,069, and the rents amounted to $169. The price was taken from the firm funds and the proceeds credited therein. Several tracts—9 quarters at least—in South Dakota were purchased, but sold after the date mentioned;

and, though J. R. contends that those taken in his name were his individual property, all were purchased from the funds of the firm, and the proceeds thereof, when sold, deposited to the credit of the firm, and this done after it had ceased engaging in any business enterprise other than dealing in land. The money derived from the sale in the name of J. R. was not invested in lands purchased in North Dakota, as we understand J. R. to claim, for these sales occurred several years after the North Dakota land had been acquired in his name. By 1906, lands had been bought and sold at an advance or a total profit to the firm of over $20,000. These deals disclose that, without any expressed understanding, other than at the beginning of the copartnership, it had drifted into dealing somewhat in real estate. (b) The partnership was continued long after all business other than caring for and dealing in real estate had been closed. Why deposit all the rents and profits and the proceeds of the land when sold to the credit of the firm, and take therefrom moneys for repairs, improvements and taxes, if these did not belong to the firm, and were not appropriate charges against it? The course of business pursued is inconsistent with any theory other than that they were partners, and that the lands bought were being handled as capital, or assets of the firm. (c) The manner of handling the several tracts subsequent to their purchase is in entire harmony with the presumption arising from their purchase with firm funds. Of course, the one having title generally directed the making of improvements and the management of the farm, though not always; but each was the agent of the firm within the scope of its business, and appropriately might look after its property. Had the money withdrawn and invested in land been charged on the books of the firm to the partner so doing, or had such partner paid from his private purse for improvements and taxes, or appropriated to his own use the rents and profits,

we should have an entirely different case. (d) The sums paid for these lands about equal the money borrowed by Smith Brothers, and the partnership was probably continued to handle and care for the lands and, from the rents and profits, or the proceeds when sold, to meet partnership obligations. Everything done in connection therewith is consistent with firm ownership and management.

On the other hand, many witnesses testify to hearing these partners refer to lands in the other's name as J. R.'s or W. C.'s farm, and in one instance, W. C. signed J. R.'s name to a lease, by himself as agent. But these statements were not made to those having any concern in the ownership, and might well have been for identification, or as indicating in which the legal title stood. No such statement appears to have been made with reference to whether the land belonged to one of them or the partnership composed of both, and the method of signing the lease, in view of the legal title's being in J. R., is not of much significance. A detailed review of this evidence will serve no useful purpose. The only bearing it has is on the intention with which the parties acted in acquiring title; and, even though the several witnesses accurately remembered and repeated the statements made by each, this would not be sufficient to overcome the inference to be drawn from what was actually · done. Nor is it material how W. C. thought the affairs of the firm would be likely to be adjusted, i. e., by having each one retain the lands in his own name, in so far as feasible, in dividing. Such a supposition furnishes no aid to the determination of what these parties intended in acquiring the lands. The amounts paid therefor from the firm assets were not charged on any books of the firm to the partner withdrawing same. The moneys of the firm were used in caring therefor. The firm enjoyed the income derived therefrom. Everything done in connection therewith, except taking title in the name of the individual mem-

bers of the firm, was consistent with ownership by the firm. It was continued in existence for no other purpose than that of handling and caring for lands and meeting obligations incurred for money borrowed, which indirectly constituted the purchase price; and it is only fair and just that out of these lands and the rents and profits derived therefrom the firm indebtedness be paid, and that whatever remains be shared equally by these men, whose joint energy, industry and intelligence have achieved an unusual success for each. We are of opinion that the lands so referred to are partnership property.

VII. As heretofore stated, J. R. furnished as part of the capital, $2,000. He withdrew, for the purchase of the farm, $3,670. J. R. then withdrew $1,670 more than he paid in. W. C. invested, as part of the capital of the firm, $8,375, and subsequently paid $5,000 received for the Des Moines lots and $9,000 paid out in foreclosure of mortgage on Minnesota land and getting title to half section in North Dakota. He withdrew $2,560 to pay for tracts of land added to his farm, $4,400 to purchase a home, $1,000 received on exchange of quarter sections in North Dakota, and $14,400 received for the Humboldt County farm. On computation, we find that W. C. has put in $15 more than he has taken out.

VIII. The partnership account was closed at the bank Dec. 21, 1910. Prior thereto, J. R. had deposited all rents received, and withdrawn therefrom all expenses. W. C. had done the same until 1909, and thereafter appears not to have deposited the rents from his farm near Eagle Grove and the Humboldt County farm, and possibly some other lands. All rents that J. R. received from his farm near Eagle Grove and deposited to the firm's credit after January 1, 1909, less whatever sum he withdrew for expenses thereafter, should be credited to him, and all rents received by him after Dec. 21, 1910, on the Mississippi and

North Dakota lands in his name, less taxes paid thereon and expenses incurred in connection therewith up to the present time, should be charged to him. W. C. must account for rents received on all lands in his name, other than the farm near Eagle Grove, after Jan. 1, 1909, and not deposited to the firm's credit prior to Dec. 21, 1909, and also thereafter to the present time, deducting taxes and other expenses incurred in connection therewith. As the cause must go back for an accounting of rents and expenses incurred by the respective parties during the years since decree was entered in the district court, we do not make the computation, but leave the matter of stating the account since Jan. 1, 1909, to the trial court, upon evidence contained in the record before us, and additional data furnished by the parties, or on such evidence as may be adduced by either or both parties.

IX. The copartnership did business largely on borrowed money. Its indebtedness at the time of the hearing in the district court amounted to nearly $50,000, and W. C. had paid, up to Sept. 29, 1913, $13,443.40 besides. Counsel for plaintiff took exception to some of the items paid, and also suggested that some of the debts outstanding should be paid by W. C. alone. All were debts of the firm, and even though for what the money borrowed was used or the debts incurred by one or both may not be recalled, neither would be relieved from contributing to their satisfaction. That the $3,000 mortgage on defendant's farm should be paid by the firm is not questioned. The trial court ordered all such obligations paid, and this is approved.

X. Though neither party prayed therefor, the district court appointed a receiver.

**11. RECEIVERS:** appointment: jurisdiction: partnership matters.

Neither of the partners nor the firm was insolvent. No disposition to defeat creditors was manifested, nor any purpose on the part of either partner to take advantage of the other.

It was merely a case where partners were unable to agree upon an adjustment of the affairs, and necessarily submitted their difference to the courts. There was no occasion for interference with the control of the property by a receiver. *Loomis v. McKenzie*, 31 Iowa 425; 30 Cyc. 726 *et seq.;* 23 Am. & Eng. Encyc. of Law (2d Ed.) 1018.

The result is that the decree of the district court is modified so that the money paid for his home is charged to W. C. and the property adjudged to belong to him instead of to the partnership; the Humboldt County land adjudged to belong to the partnership instead of to W. C. individually; the rents collected by J. R. from the Mississippi and North Dakota land between Jan. 1, 1909, and Dec. 21, 1910, to belong to the firm, and not to be credited to him individually, as was done by the trial court; and the order appointing a receiver reversed. One half of the costs will be taxed to each party, and the cause remanded for an accounting of rents and profits and expenses up to date.. The proceeds of any of the land adjudged to belong to the partnership sold by either party will be treated as the equivalent of the land.—*Modified and Remanded.*

GAYNOR, C. J., EVANS and SALINGER, JJ., concur.