F. GLENN WELLMAN et al., Appellees, v. H. HAGEN WELLMAN et al., Appellants.

JUNE 26, 1928.

*William S. Hart,* for appellants.

*D. W. Meier* and *D. D. Murphy & Son,* for appellees.

STEVENS, C. J.—Glenn, appellee, the appellants, Hagen and Leslie, and Walter, not a party to the record, are brothers, the sons of L. A. and Lena Wellman. The mother, Lena, underwent an operation for cancer in April, 1924, and died October 28th following. On June 10th or 11th, after she returned from the hospital, she executed a bill of sale of her household furniture, and also a warranty deed to the family homestead, title to which was in her, conveying the same to Hagen and Walter. On the same day, she transferred two notes for $2,000 and $1,300, re-

446

spectively, bearing date April 1, 1924, executed by Glenn and wife to her, and also assigned two real estate mortgages given to secure the payment of said notes, to her two sons. In addition to the foregoing, a checking account in the bank, showing a balance of $288.88, a savings account of $1,323.05, and $1,000 in Liberty bonds were also transferred to the same persons. For reasons hereafter considered, new instruments were made out on June 14th, in which the name of Leslie was substituted as grantee and assignee in the respective instruments, for Walter. The same changes were made in the indorsements on the back of the two notes. · On August 25, 1924, the mother executed another instrument in writing, known in the record as Exhibit G, in which she expressed the desire that priority in the settlement of accounts available from funds in the Farmers State Bank be acknowledged as follows: Funeral and medical expenses; the payment of $400 to her husband, for some clothes and running expenses until he resumed his occupation as a traveling salesman; $50 per month to Elsie, appellee's wife, for the services rendered during the mother's illness; $50 for cemetery rights and care; $1,000 each to appellee and Walter, credit to be given therefor on their respective notes; $2,500 to Hagen, upon condition that he transfer a certain mortgage of $1,785.24 to the joint account of himself and Leslie; $1,000 to Leslie, to be paid in cash as soon as available from the accounts and properties of the estate.

Hagen and Leslie, in writing, agreed ·to carry out the terms of the foregoing instrument. On November 19, 1924, Hagen and appellee entered into a written agreement, known in the record as Exhibit H, to which we will again refer. On December 20, 1924, Glenn and Elsie, his wife, instituted this action in equity, to recover the amount due her for services rendered to Lena, and for the cancellation of the warranty deed conveying the homestead to appellants. Elsie withdrew as a party, and on May 17, 1926, Glenn filed a substituted petition, in which he charges that the conveyance of the homestead to appellants was obtained by fraud, and asks that the same be canceled and set aside, or that appellants be decreed to hold the title thereto as trustees for the father and the several sons and brothers.

The court in its decree gave effect to the terms and provisions of Exhibit G, found that the deed from the mother to the appellants was executed for the purpose of facilitating the settle-

ment of her estate, and that it was not her intention to vest the absolute title in the grantees,—which fact was well known to them,—and decreed the title in them as trustees, for the purpose stated.

The case presents no difficult question of law. It does, however, present extremely troublesome and perplexing issues of fact. The Wellman family long resided at Monona, Iowa. The father and grandfather of the parties to this action at one time owned and operated a local light, water, and gas plant at Monona. About 1908 or 1909, the plant and business were taken over by the sons Hagen, Leslie, and Walter, and the Monona Light & Power Company, a corporation, was organized, and the business carried on for several years, when it was sold to the Mid-Continental Utilities Company, for a consideration of $31,500. The stock of the corporation at the time of the sale was owned as follows: Hagen, 99 shares; Leslie, 50; Walter, 1. It is the claim of appellants that, during the time they operated the electric light and power company, they made advancements to the mother and paid obligations for her and their father aggregating more than $17,000; that these advances and expenditures were never repaid; and that these expenditures constituted the real consideration for the deed and other instruments of conveyance. The consideration expressed in the deed was $1.00, love, and affection. The proof offered of the advancements made by appellants consisted of the testimony of Hagen and the father. The former went into detail, giving what purported to be the items going to make up the aggregate amount. The memorandum used by the witness, he testified, was a copy made by him of the books of the Light & Power Company. The original books were thrown into the furnace at the time the plant was sold by the brothers, and burned. For several years, Leslie has been an officer in the Marine Corps, stationed in Haiti, and Walter a practicing dentist, at Montevideo, Minnesota. Neither were present at, nor gave testimony in the form of depositions upon, the trial. Hagen further testified that he did not know of the execution of the papers on June 10th or 11th until later; that he in no way participated therein, and we gather from his testimony that he had little, if any, prior conversation about the matter with his mother. He also claims that the $3,300 indebtedness of appellee to his mother, evidenced by the notes above

referred to, was originally owed to him, and that he assigned the same to his mother, in order that she might receive the interest for her necessary living expenses. The testimony as to the origin of the note is not disputed. We gather from the argument of counsel that the claim of appellants is not so much that the alleged advancements by the brothers were the agreed consideration for the deed, as that they furnished the real motive of the mother in voluntarily conveying and assigning the property to them. The testimony of Hagen is to some extent supported by that of the father, who did not, however, go far into the details of the several transactions.

Much of the testimony of Hagen is contradicted by appellee, his wife, and K. W. Rash, the cashier of the bank in which the mother kept her account. Elsie testified that, very soon after she began caring for the mother, a quarrel ensued between Hagen and his mother at the breakfast table, over the demands of the latter for the payment by the former of his board; that, in this conversation, Hagen called his mother "a damned Norwegian." The evidence shows that Hagen paid his mother board, and a receipt for $939.53, dated March 1, 1921, therefor, was introduced in evidence in his behalf. Elsie further testified that she overheard angry conversation between Hagen and his mother in the latter's room; that, on the occasion at the breakfast table, and when other quarrels ensued between them, a doctor was called, and hypodermics given to the mother. She also testified that Hagen was present when the papers were executed, and directed the notary that it was unnecessary that same be read to his mother. The papers were, however, carefully read to her and explained by the notary. The record discloses other testimony by Elsie contradictory of that of Hagen. Rash, the cashier of the bank, and the notary who prepared the papers, testified that Hagen came to the bank on June 10th or 11th, and informed him that his mother desired to make the conveyances and assignments referred to; that he then prepared the instruments, and in the afternoon, went to the house, where the same were signed by Mrs. Wellman, in the presence of Hagen. This testimony is either denied *in toto* by Hagen, or he was unable to remember what occurred. The instruments, when executed, were turned over to Rash, to be held by him in escrow until the death of the mother. Very shortly after the first instruments were executed,

a telegram and letter were received from Walter, declining to be a party to the transaction. The reasons assigned by appellant for Walter's refusal were that he had been paid in full for his interest in the Light & Power Company, and would accept nothing further. Elsie testified that she saw the letter written by Walter, and that he declined to act in the capacity indicated, or to participate in the settlement of his mother's estate. It is suggested that the mother may not have known that Walter had been fully paid, at the time the first papers were executed. The facts as detailed by one or the other of the witnesses constitute the reason for the substitution of the name of Leslie for that of Walter. Neither the telegram nor the letter was offered in evidence.

The deed, bill of sale, and mortgage assignments were filed for record June 17th. Rash testified that Hagen came to the bank, and requested him to forward the instruments at once for record; that he told Hagen he would not do so without a written order from his mother; that, later in the day, an order in Hagen's handwriting, signed by the mother, was presented at the bank by Hagen, and the several instruments were immediately forwarded to the county recorder for record. Hagen denied that he was at the bank, or that he talked with Rash at any time about either the execution or the recording of the instruments. Hagen and his father both testified that the latter conducted all of the negotiations with the bank; that it was he who requested that the instruments be sent for record; and that the order signed by the mother was prepared by Hagen at the father's request, and taken by the latter to the bank.

Appellee, as a witness in his own behalf, testified that he was present at the parental home on the morning of the day on which the first instruments were executed; that he overheard a conversation between Hagen and his mother in his father's presence, in which he took no part. The substance of the conversation, as detailed by him, was that Hagen returned from the bank with a statement of the amount of moneys and credits therein; that he told his mother that the property should be deeded to him, so as to avoid the claims of creditors; that, by so doing, more would be left for the brothers; that he would hold the property in trust, so long as the father should live; and that, after his death, the brothers, except Hagen, would receive equal

shares. Hagen then demanded that he receive $1,500 more than would be paid to the others. Appellee also testified that the mother said to Hagen, in the conversation, that it was a pity it had to be done that way. Both the father and Hagen denied that any such conversation occurred, or that appellee was at home on the day mentioned.

There was no reason, if the facts are as claimed by Hagen, why he should not have participated in the transaction, and frankly disclosed to the court all that occurred. His answers to questions upon cross-examination were sometimes evasive, and he frequently stated that he did not remember. It is difficult to believe that he could have been so forgetful of so many vital facts of the transaction. His testimony is discredited by the other witnesses, particularly by that of the witness Rash, who had no interest in the controversy. We are satisfied that the facts concerning the transaction, so far as known to him, are as detailed by Rash.

We referred at the outset to Exhibit H, an agreement in writing, signed by appellee and Hagen. No significance is apparently given by counsel for appellee to this evidence. It is referred to by counsel for appellant, in argument, as a mere arrangement for the better security of the indebtedness of appellee to Hagen. Hagen testified that the only property of the estate of his mother was $400 interest due from appellee on the $3,300 note. He further testified that all of the funds in the bank were necessary, and used in the payment of indebtedness owed by the mother. The interest due from appellee had not been paid, at the time of the trial. The financial condition of the estate was known to Hagen on November 19th, when Exhibit H was executed. In view of the foregoing claims of Hagen, it is difficult to understand why Exhibit H, containing the following provisions, was executed:

"It is fully understood by both parties that the party of the second part hereby transfers from his interest in his mother's estate to the party of the first part, his heirs or assigns up to and including the amounts owed on these notes, interest and open account to this date. Any deferred payments shall bear the rate of 6% interest and shall be deducted from second party's share of his father's estate as under his mother's wishes. It is understood that the interest shall become due each and every year on

any unpaid amounts. It is also agreed by both parties that the party of the first part shall cancel and deliver notes to second party when settlement of their mother's estate is made or any date before if payment is made. It is understood by both parties that the first party shall choose amount to be paid from their mother's estate in so far as second party's interest is concerned under this agreement. This agreement does not compel the first party to accept the above transfer but can do so by written notice to Leslie Wellman sending letter to his last known address.''

It seems to this court that the foregoing recitals contradict many of the claims asserted upon the trial by Hagen. If the assets of the estate consisted, at most, of $400 owed by Glenn, Exhibit H was not only valueless, as security, but was for any other purpose of little or no value. We are convinced that the mother was induced by Hagen to place the title of the property in him and Leslie for the purpose of preserving and facilitating the settlement of her estate, and not in settlement of advances made by the corporation for her benefit and that of her family, and that it was not her intention to otherwise favor him. The substitution of Leslie's name for that of Walter in the several instruments was for the reason that the latter was unwilling to become a party to the transaction or to participate in the settlement of his mother's estate. At the time of the execution of Exhibit H, Hagen must have believed that his mother left an estate far in excess of unpaid interest to the amount of $400. Exhibit G was prepared by Leslie, when home on a visit.

It is, of course, true that a wholly unexecuted express trust in real property, although not void in this state, may not be proven by parol. In so far, therefore, as parol testimony was offered for that purpose, it cannot be considered. This does not mean that the testimony of appellee as to the conversation between his mother and Hagen is to be denied probative value for any purpose. It was admissible as throwing light upon the transaction, and as tending to contradict and negative the testimony and claims of Hagen and his father. Competent proof of an express trust was not necessary, in this case. The rule is well settled that, where a conveyance of real property is made without consideration, and it appears from the circumstances that the grantee was not intended to take beneficially, or where the

grantee accepts the conveyance from the grantor, knowing that it was not part of his intention to bestow a gift or to confer a benefit upon him, or where the conveyance is induced by fraud, a constructive trust arises, and the grantee will be deemed to hold the title in trust for the benefit of the beneficiaries intended. This is also true where the grantee obtains the title in himself, knowing the purpose of the grantor, but having no intention of carrying out such intention. *Dunn v. Zwilling Bros.*, 94 Iowa 233; *Stout v. Stout*, 165 Iowa 552; *Newis v. Topfer*, 121 Iowa 433; *Williams v. Williams*, 108 Iowa 91; *Acker v. Priest*, 92 Iowa 610; *McClain v. McClain*, 57 Iowa 167; *Gregory v. Bowlsby*, 115 Iowa 327; *Wahl v. Taylor*, 176 Iowa 353. In *Gregory v. Bowlsby*, supra, we said:

"But the statute was not enacted as a means for perpetrating a fraud; and, if fraud in the original transaction is clearly shown, the grantor will be held to be a trustee *ex maleficio*. If, then, there was a fraudulent intent in procuring the deed without intention to hold the land as agreed, and pursuant to that intent the grantee disposed of the property, or otherwise repudiated his agreement, equity will take from the wrongdoer the fruit of his deceit by declaring a constructive trust."

We are abidingly satisfied from the record, the transcript of which we have read carefully, that the deed to Hagen was obtained under such facts and circumstances that a constructive trust arose in favor of the father, Walter, and the parties to this action. No doubt, the record contains facts to which we have not referred, more or less favorable to the respective parties; but we have, in a general way, recited the essential facts of the transaction. Further discussion is unnecessary.

The decree of the court below, which made full and ample provision for carrying out the trust, is affirmed.—*Affirmed.*

DE GRAFF, ALBERT, MORLING, and WAGNER, JJ., concur.