MARY COOMES HULL et al., Plaintiffs, v. JAMES E. PADGETT et al., Defendants.

J. S. MOORE, Appellee, v. JAMES TROY, Administrator, et al., Appellants.

JANUARY 23, 1929.

*Thomas J. Bray, Devitt & Eichhorn,* and *Le Roy E. Corlett,* for appellants.

*McCoy & McCoy,* for appellee.

MORLING, J.—The ultimate question in the case is whether plaintiff was merely the hired servant of decedent or a copartner with her in the business of farming and in the property acquired thereunder. Plaintiff (commonly called Sherman, or Sherm), in 1891 and 1892, worked as a farm hand on a farm which had belonged to decedent's father, and on which decedent and her mother were living. It is claimed by defendants that the mother was operating this farm, and plaintiff was in her employ, not only during those first two years, but until the mother's death, in 1900.

Plaintiff quit in 1892, and returned in 1893. Did he return as a hired hand, and as the employee of the mother, or did he and decedent become coproprietors or copartners? 66 acres of the farm, including the buildings, had been set off as the property of the mother. 22 acres, largely brush land, then worth $35 per acre, had been set off to decedent. The remaining 32 acres belonged to decedent's brothers and sisters, the defendants.

A neighbor, who had known plaintiff 45 years, testified that he knew, when plaintiff first went to work, that decedent wanted to hire him. "I told him that Miss Padgett had requested me to send her a hand, and I recommended her to Mr. Moore, and he hired to her." A neighbor across the road testified, without objection, "I understood that Ollie run the place while her mother was living." An intimate friend of decedent's testified that decedent, after plaintiff came back, expressed her pleasure "to think she got him back," and "said she guessed she got him to stay now. They were working together." It was stipulated that no personal property had been assessed to the mother from 1892 to 1900. When the mother died, in 1900, she left no personal property except three horses, a sleigh, one spring wagon, and household furniture. She still owned her 66 acres. The interest of decedent's brothers and sisters in the father's farm was purchased. In 1898, an 80 called the Pomeroy 80 was purchased. The daughter of one of defendants testified that she heard decedent speak about the purchase of land belonging to the heirs.

"She has said, 'when Sherm and I bought,' 'when we bought;' and I have heard her speak both ways. When they bought the heirs, and when they bought the last 80,—the Pomeroy 80. * * * Q. Referring to the hogs and stock and land, how would she refer to it? A. 'As Sherman and I, or we.' * * * I remember, about two years before she passed away, she told me in the fall she would like to go away for her health to a milder climate, but she didn't want to go away and leave Sherman; that he had as poor health as she had, and she didn't think it would be right for her to go. That 'he has the same interest here as I have. It wouldn't be right for me to go and him stay.' She said, 'I think the thing for us to do is to rent the farm, and both go away for our health.' * * * She often said, 'We both worked hard;' that she thought they needed a rest. That was when she was speaking about renting the farm. That they both worked so hard to pay off the debts, and they had gotten to the place where they could rest easier, and she thought they both ought to leave the farm."

After the mother's death, a purchase of the interest of the other heirs in the mother's 66 acres was made. The evidence is undisputed that plaintiff and decedent together borrowed money

to make payments on land purchased, and together they signed notes for the money borrowed. Neither decedent nor plaintiff had means of any consequence, except what was made from their farming. A witness testified to renting 85 acres to decedent and plaintiff, some 15 years before the trial; that decedent said "they [decedent and plaintiff] was working together," and as to what they owned, "they owned it together." One of the laborers on the farm testified that he was employed by plaintiff, and heard decedent say " 'that we bought the north eighty;' heard her say, 'We bought out the other heirs' interest in the farm, and paid the money for it.' " A neighbor testified that decedent said, on more than one occasion, that she and plaintiff "were in partnership," and that he had so known from her statements 30 years or more; that plaintiff asked him if he would loan plaintiff and decedent $1,000; that he loaned the money, and "if I remember right, they both signed" the note. Asked whether, in his visits and talks with decedent, decedent said anything with reference to the purchase of any lands out there, he answered, "She said they had bought such and such a piece of land." A banker testified that decedent wanted to borrow $2,000, and said that she and plaintiff would sign the note together, which they did.

"She made the remark when he was talking about the security. She said that Sherman would sign the note; would be in together. As I remember rightly, I said, 'Sherman is working for you by the month.' She spoke in this way, she said, 'no,' she and Sherm was operating together. * * * She said that she and Sherman were partners; that was the sum and substance of it. * * * It was a good while ago."

A farmer who testified that he worked for decedent in 1919 and 1920 said that plaintiff paid him part of the time, and decedent part of the time, and that plaintiff directed his work; says that, in talking about a carload of hogs:

"I asked her if she would give me over all that much they would fetch. She said: 'Why, no. What would I have left, after Sherman got his half, and my half, and me give you my half?' I said, 'Why, does Sherman get half of this?' She said, 'Half of everything we get goes to Sherm.' "

Another banker testified that he had written some fire insurance for them; that decedent said "they were farming there together * * * were running it [the farm] in partnership. * * * Did she use the term 'partnership?' A. Yes; her and Mr. Moore had the stock in partnership. That was between 1915 and 1920." A stock buyer testified that decedent and plaintiff "always said it didn't make any difference which one got the money. It was all the same. They were in partnership." Another stock buyer says that "I bought stuff of Sherman several times in those years, cattle and sheep both. * * * I always paid Mr. Moore by check;" that, one time, the matter of her health came up. She said "her and Sherman had worked hard all their life, and she said they was going to take a trip; they wasn't able to do the work any more,—intended to get out for the winter and leave it." Some twelve witnesses testified to statements made by decedent at different times, in substance that she and plaintiff were partners, or equally interested, or owned the property together. It is shown that decedent and plaintiff rented land together. Witnesses testified that decedent said that they had the land paid for; that they were out of debt; that they had both worked hard, in order to pay for the place and have a home, and they did not want to leave, and one go away for their health, and the other not go; "that they both worked so hard to pay off the debts, and they had gotten to the place where they could rest easier, and she thought they both ought to leave the farm." "She said Sherman wasn't able to work. He would just work, and she didn't want him to. * * * 'He doesn't have to work. We have enough to keep us, anyhow.' " A witness, asked what he had heard decedent say with reference to her and plaintiff's purchasing land, said, "I heard her say, along about the time that they had the land paid for, that they were out of debt." This witness says that, a few years after the new house was built, "we were talking about the house, and it was a large house, I thought, for two people. I made the remark to her, 'Wasn't that an awful big house for two people?' 'Well,' she said, 'Sherman and I have worked hard, and want a good warm place to die.' " That the sentiments of decedent and plaintiff toward each other were more than those merely of master and servant is proven not only by these declarations, but

by the undisputed fact that they bought two crypts, side by side, in the mausoleum, one deeded to each.

The north 80 had improvements upon it, the land was tiled, the brush cleaned off the 22 acres, and a new home built. Many thousands of dollars were laid out in improvements. The evidence is without dispute that plaintiff and decedent planned the house. Plaintiff ordered and paid for material, employed and paid the workmen. Plaintiff bought and sold the live stock, bought the implements and material used on the place, and received the money for the produce sold.

All of the money realized from the farming operations was deposited in the bank in the name of decedent. At first, the money was deposited in the form of certificates of deposit, some of which were in the name of plaintiff. The certificates were afterwards put into a checking account, and the checking account was always kept in decedent's name. Both checked upon the account. Checks drawn by plaintiff were signed by him in decedent's name, ''by J. S. Moore.'' The bank treated the account as joint. A banker testified that plaintiff would have been permitted to draw any portion of it. Plaintiff had no checking account of his own. Their method seems to have been largely to draw cash from the bank on checks signed by either of them, and use the cash in making payments. The business generally was transacted in decedent's name, and legal titles taken to her. Decedent and plaintiff bought Liberty bonds together. A local telephone company was organized. They signed the organization papers. Plaintiff was an officer of this company for many years. Decedent and plaintiff made out the assessment rolls together. One of the assessors testified that decedent said that plaintiff would give in the assessments,—''he knows more about them than I do.'' ''All I know, he said it didn't make any difference which one of them signed it.'' Some of the assessment rolls for the live stock were signed and sworn to by plaintiff. Plaintiff had a horse which was considered as his, and decedent had one which was considered as hers. Plaintiff gave individual assessments for this horse, which, according to the roll therefor, was all of his taxable property. Plaintiff directed all of the outside work; decedent attended to the inside work, and directed prospective purchasers of stock or produce to plaintiff.

The neighbors testify without conflict that plaintiff worked hard, and worked all the time,—one of the first in the field, and one of the last to leave; that he was the best, or one of the best, farmers in the neighborhood; that he was a good manager and good business man. The evidence (with little exception) is that plaintiff did everything that the proprietor and operator of a farm ordinarily does; that he and decedent consulted together to the same extent (but the evidence does not show to any greater extent) that the man and woman on the farm, the one attending to the farming operations, and the other to the domestic labor, ordinarily do. The property was kept and the business done in the name of decedent in about the same way that a husband frequently takes property and conducts his business in the name of his wife. They consulted together about such matters as the bathroom fixtures, installing radio and light and power system. They kept books, which, however, have not been certified to this court. One memorandum in the printing here is: ''January, 1921. We owe hog hauling Vroom * * * Owe us hauling hogs Joe Bailey * * * 1923 Owe us hog hauling Joe * * *'' Besides the twelve witnesses testifying to decedent's statements that she and plaintiff were partners, equally interested, owned the property together, or the like, ten witnesses testified to her statements such as ''we bought,'' ''we could sell,'' ''we had done so and so.'' Defendants argue that plaintiff organized his neighbors; but we cannot assume that plaintiff accomplished so difficult a feat, or that a whole neighborhood can be so indicted. The testimony comes, not merely from the neighbors, but from bankers, dealers, and insurance agents. The insurance, of course, was taken out in decedent's name, though in consultation with plaintiff. The plaintiff examined 55 or more witnesses, including himself. The plaintiff testified in detail to his business relations with decedent. As to a large part of his testimony, he is, under the ''dead man's statute,'' not a competent witness. Besides, in 1919, before decedent's death, in an action which we infer was brought by a domestic, to recover wages, but the nature and circumstances of which are not explained, plaintiff testified that he worked for decedent's mother until she died, and in 1900, and since then, had been working for decedent as a farm laborer; that he was not in partnership with decedent at any time,—simply working by the month.

The case before us is not one of a trial of plaintiff for perjury, or to punish him for perjury by decreeing a forfeiture of the rights of property which the evidence here may show he has, though denied by his former testimony. This former testimony has two aspects: one an admission by plaintiff; and the other, impeachment of his testimony here.

Defendants urge that the testimony is conclusive against plaintiff's present claim. It cannot be so regarded. This former testimony does not constitute a contract, nor does it provide, under the facts here, basis for any form of estoppel. It is an admission, of the circumstances of which we are not informed. We do not have before us the claims of the parties then in issue, or all of the evidence. Plaintiff testified here to the existence of the partnership as claimed (though in this he is not competent), and says that, if he formerly testified that he was not in partnership, "what I had reference to was when I first went there to work—the first two years," and that he never testified that he worked for decedent's mother. "If I did, I was mistaken—didn't understand the question. * * * I never worked for her in my life." Plaintiff's testimony (so far as he is competent) in this case cannot be summarily wiped out with the mere fact of his former seemingly contradictory testimony in another case. The defendants cannot demand that his testimony then, in an action to which they were not parties, be accepted in preference to his competent testimony here, in total disregard of the rest of the evidence.

The plaintiff's former testimony, however, does impeach his credibility. We are not sufficiently satisfied with his explanation to accept his testimony here, further than when he is not only competent, but when he is corroborated.

The value of the personal property and money on hand at time of decedent's death appears from the arguments to have been about $20,000, and the total estate, including realty, somewhere around $60,000; so that the claim filed was for nearly one half.

Defendants offer the testimony of the domestic who was plaintiff in the former case, that plaintiff here "got drunk once in a while;" that (over objection) decedent said plaintiff was there just as a hired hand; that she (decedent) would tell him (plaintiff) when to sell; that she (witness) never heard dece-

dent say whether plaintiff had any interest there; that she (decedent) said she was boss.

She says, on cross-examination, that she had seen plaintiff drunk two or three times,—so drunk "you didn't know whether he was a dead man or a live man,"—covering about 14 years; that he would be drunk on an average of once a week. Defendants also introduced the testimony of a hired man that plaintiff said, about 1910 or 1911, that he was working by the month; that decedent always told him that plaintiff was working by the month, the same as witness was; that witness was paid by the month; that plaintiff and witness had a fuss, and witness told plaintiff he was going to quit. Defendant Sarah Caldwell, a sister of decedent's, testified to plaintiff's being drunk, and that, after the mother died, decedent "asked him if he would stay there and work for her, the same as he had worked for my mother * * * He said he would. Q. Anything else said between them? A. No, and he stayed. Q. Was anything said about the amount of wages in that conversation? A. Just the same as my mother gave him—$25 a month. * * * Saw her [decedent] give him money nearly every Saturday. * * * [Decedent] said he [plaintiff] spent his money faster than she gave it to him,— faster than his wages came to. * * * After he came back, she paid him $35,—$35 in the summer, and worked for his board in the winter. * * * She always kept a book account." This witness testified that her mother, at the time of her death, had $300. "My sister [decedent] got it and kept it. She had no more right to keep it than the rest of them." She says:

"I know he [plaintiff] drank all the time, because my sister said so. * * * My sister opened the furnace, and said it was where Sherman kept his whisky and tobacco, to keep the other hired hands from getting it. * * * Every time he went to town, she gave him money. * * * She asked me to go in Sherman's room and look in his pants for tacks. * * * She went in. I didn't go in the room with her. She came back with a handful of dice. * * * She took the dice back, and put them in his pocket."

Witness testified, also, that, after decedent's death, Nellie Cruzen and plaintiff "was reading books and papers, and tearing them up and burning them up * * * some account books, like that, only bigger;" that she found there the contract by

which decedent agreed to give Nellie home and schooling. "Just happened to find that; wouldn't have gotten that, if they had found it first." She says that, one morning, witness saw Nellie hand plaintiff a roll of bills, "as big as your wrist;" that witness did not know whose money it was.

"He told me he didn't have any money, so I don't know where he got it. * * * Q. Told you he had spent it all, drinking and throwing dice? A. He didn't tell me that that is where he spent it. Q. You knew he spent it that way? A. So did everybody else. The whole neighborhood. * * * Q. Didn't you say just what I asked you; that you would spend every God damn dollar that you had, before you would give him a penny,—didn't you say that? * * * [Objected to.] A. Yes, I said it."

A daughter of defendant Nathan Padgett's testified to statements made by decedent to plaintiff: "We do not have any sheep to give away,—those sheep are mine;" that decedent said she had been helping defendant James Padgett,—had paid out over $7,000 for him; that "she had to pay out $75 a month for hired help,—was too much for her. She wanted my father to come up and stay with her. * * * Father said, 'I do not think Sherman and I would get along.' She said, 'What difference does that make to Sherman? He is nothing but a hired man. He could go, if I had you here. I would not need to keep but one hired man.' * * * She said his health had gotten so poor, had to have an extra man in the winter to do the chores; it was getting to be too much for her * * * Said she was—had to take care of him so much—always had a doctor bill. She was getting tired of it. * * * Yes. She said that she paid him $35 a month for 8 months of the year, and the remainder of the time he was just choring, and worked for his board. * * * She said Sherman spent his money faster than he earned it. I made the remark, 'That is too bad, because, when he gets old, he may need his money.' I said, 'Why don't you talk to him?' She said: 'I have talked to him until I am black in the face, and it isn't in him to save his money.' " Witness says that she never heard plaintiff claim any interest in the property, or any partnership or arrangement, before he filed his substituted claim; that her father was 76 years old, and "decedent wanted him to come and stay with her, and help her look after the farm. * * * That is the

way I understood her to say." With reference to the signing of the paper in this suit by defendant Frank, witness says:

"Q. You went down to Ottumwa, you and your Aunt Sallie and your father, and jumped onto Frank because of his position in this lawsuit, didn't you? (Objected to) * * * A. No, I didn't jump onto him. I talked to him. Q. Sallie talked to him? A. She said but very little. Q. Your father talked to him? A. He said but very few words. * * * Q. He [Frank] told you, in that conversation at Ottumwa, he signed papers, he didn't know what he signed? A. He certainly did,—never read it over. * * * A. Well, Sherman Moore was taking a paper down there for him to sign, and he didn't know what he was signing. I thought it was time he knew what he was signing * * * His daughter said he should have a guardian appointed, because he was signing things he didn't know what he was signing."

This witness testified that Frank said he had not signed a paper to allow plaintiff $28,000; that he signed a paper, but it was "no paper to allow him $28,000."

Defendant Nathan E. Padgett, a brother of decedent's, testified that he is 78 years old; that he told plaintiff, during the negotiations for settlement, "I told him I didn't think he had a dollar coming. In a conversation I had with my sister before that, she said she didn't owe him anything. * * * Well, I told him that I wouldn't pay it; that I would law the place away, and what little I had myself, first, before I would pay it. * * * I never heard anything about the partnership business." He testified that, during the negotiations, plaintiff did not claim to own any portion of the property; that decedent "wanted I should come up *.* * Well, I told her I didn't know about that, —didn't know whether Sherman and I could get along together. She made the remark, 'Sherman is just a hired man here.' He can go any time he is a mind to.' " He testified that he heard decedent say she received $1,300 from their uncle; that, at a family reunion at the home of Frank Padgett, witness had talked with plaintiff about his employment by decedent, and plaintiff "said he was working by the month."

Another witness testified that, about 14 years previously, she asked decedent "how she liked her hand. She said that he was just fine,—was a good hand. * * * He wanted some money.

He had been there three years, and he was always out of money * * * She said her health was very poor. I said, 'Why, don't you come to town?' She said, 'Oh, I couldn't think of it. I have always lived there, and I wouldn't be satisfied any place else.' She said, 'Sherman had always been a very good hand and I want to make a home for him while he lives.' * * * She said she didn't want to leave Sherman. She wanted to make a home for him. He had not worked for three years. His health was poor. * * * Yes, she said she paid him every month, and he was always out of money.''

Rebuttal testimony contradicts alleged drinking habits and gambling. It is shown, without contradiction, that leaves were torn from books in decedent's possession. The books are not produced here. If the mutilation was such as to destroy accounts, they would contain some evidence of that fact. The mere fact that pages have been torn from a family account book, without anything further, proves nothing. The testimony of defendants' witnesses is so irreconcilable with the otherwise undisputed evidence of disinterested witnesses and the established fact of plaintiff's industry and achievements and decedent's confidence in and sentiments toward him, and is, to a large degree, as has been indicated, so splenetic, that the trier of fact can give it little weight.

Plaintiff filed a claim stating that, from February 19, 1891, to March 29, 1926, he, at the request of decedent, ''worked for her as a farm hand and manager on the farm * * * for which there is due him $28,000, as the fair and reasonable value'' of the services. The claim alleges that the administrator approved it, and that J. E. Padgett, Frank Padgett, N. J. Barber, and Mary Hull, heirs, directed its payment. The contentions of the parties largely revolve around this claim and the circumstances under which it was filed. The administrator is a warm personal friend of the plaintiff's. On the other hand, he is a cousin of defendants'. He had, and (except as to his attempt at settlement) appears still to have, the confidence of all the heirs. He was made administrator at the suggestion of defendant Nathan and Nathan's daughter. While his testimony is contradicted by some of the heirs and their children, we are impressed by his rugged candor and truthfulness and sense of duty; and though, as he said, he was rather hard of hearing, and ''after you live,

and realize you are 72 years old, you will find that your memory is not as good as it was at the age you are now,'' we are of the opinion that his testimony is in harmony with the facts, is consistent, and correctly sets forth and explains the cause and circumstances attending the filing of plaintiff's claim. The administrator testifies that, before his appointment as such, plaintiff said he owned one half of the property; that Nathan, Miss Caldwell, and James Padgett were present. Witness says:

''As I understood, the first two years he was working for wages, and they had settled, and they had some trouble, and they compromised that trouble, and he had been there for 33 years, but he had drawn wages only for the first two years;'' that, at a later time, plaintiff said ''he had nothing to show in writing. The only contract they had was oral, was the way I got it.'' ''My recollection is, I suggested to them something like that. It wasn't my business. It was Sherman's individual claim, but I suggested he better put it in some form so the heirs would know how to handle it: that is, by compromise or otherwise. * * * As I remember it, it was generally understood with all parties there concerned that he was to file his claim, and would go ahead with the farm,—it was pretty well stocked,—and carry out the contract that Ollie and Sherman had made, and have a sale in the fall.'' Witness testified that, in compliance with this understanding, plaintiff filed his claim, and he approved it. ''That was before he [plaintiff] had employed anyone, or started to. My understanding of approving that was merely to give my consent to help compromise the business.''

The following paper was thereupon signed:

''Exhibit S.

''To James Troy, Administrator of the estate of Ollie I. Padgett, Deceased:

''We, the undersigned, heirs of Ollie I. Padgett, deceased, knowing the justness of the claim of J. S. Moore against the estate of Ollie I. Padgett, deceased, authorize and direct that you approve the said claim in the sum of twenty-eight thousand ($28,000) dollars, and authorize and direct you to pay the same.

''J. E. Padgett
''Frank Padgett
''N. J. Barber
''Mary F. Hull
''James W. Troy, Admr.''

Witness says: "That was before it was entered into court. After it was entered into court, I withdrew my name. I didn't know what he was entitled to—the amount." The witness joins in answer with the defending heirs. Witness testified that plaintiff said "he had been there for 35 years, and the first two years, they had settled up. The last period was 33 years. Q. You understood at that time he was claiming wages for 33 years? A. Now you have got it. Q. That is right? A. That is the way I got it. * * * Q. * * * When Sherman made the statement at the bank, at this meeting, that he had wages coming for 33 years, that is the first time he had ever said about any claim against the estate or any interest in it,—isn't that right? A. Why, I think so. Sherman nor Ollie never told me anything about their business previous to that, during her lifetime." Witness testified that plaintiff said he had figured the claim by "the scale wage. * * * He figured the first 11 years at $35 a month, the second 11 years at $45 a month, and the third 11 years at $60 a month. * * * I think he figured it at compound interest, at the rate of 4 per cent. * * * He said he had instructed the young man that figured it up to take out, after he got the final amount, $100 a year for his wearing apparel and everyday shoes and things." Witness says that plaintiff made the statement that he thought he ought to have $25,000. "I think it was my suggestion that he filed his claim. That was my understanding. They seemed to universally express that. They didn't set the price, but they asked him to file his claim."

Appellants emphasize the plaintiff's making no objection to the administrator's sale of property, and the fact that plaintiff worked on the farm after the administration, acquiescing, as is claimed, in defendants' claim of ownership as heirs, except as to one horse. The administrator testified:

"The impression I got that day with the heirs and parties that was interested was, we was to carry out the arrangement of Ollie and Sherman, and raise the crop and carry the stock until fall, and then have a sale. Later, I got the impression that Nate and some of them had been to see four of the heirs, and wanted to have a sale. Then counsel said to me, if they wanted a sale, better have it."

There is much dispute in the evidence as to when and where

the various conversations between plaintiff and the heirs took place. It would be profitless to enter into a discussion of this controversy. The administrator, on defendants' cross-examination, testified that plaintiff "said he had talked to Ollie, in the last six or seven years, at different intervals, after Ollie was affected with a weak heart, when she had them spells; he had suggested, 'Ollie, we better get our business in some form, neither of us have a lease on life. If you should happen to be suddenly called away, it would give me trouble. On the other hand, if I should be suddenly called away, my folks would give you trouble. I think we had better get it in legal form.' At one time, Ollie did say: 'You need not worry. I have got that fixed.' It would pass on, until she would have another spell with her heart. She would get over that, and he would repeat the conversation. After Ollie would straighten up, and get a little better, she would say: 'Sherman, I have not got it fixed. I am going to. I have just neglected it, and got nothing done.' * * * He said she had told him at different times she had made a will; but my recollection, he didn't say who Ollie said she had made it to. That is my impression."

Plaintiff's claim for wages was filed September 13, 1926. On October 5, 1926, he made application to the court for an order to the administrator to turn over to him one half of all the personal property and crops. On December 29, 1926, he filed an amended claim, referring to the action for partition then pending, and asked that, if the property was not decreed to be the property of the partnership or joint enterprise, that he have accounting for services.

On September 3, 1926 (before the claim was filed), a petition was filed by Mary Coomes Hull and William H. Padgett against James E., Frank, and Nathan H. Padgett, Jennie Barber, Sarah Caldwell, and the administrator, for partition. On October 4, 1926, Nathan H. Padgett and Sarah Caldwell admitted the allegations of the petition that decedent was the owner of the property, and each of the parties (other than the administrator) was the owner of an undivided one-seventh interest. On October 5, 1926, defendants James E. Padgett and Frank Padgett answered, denying that decedent was the owner of the property, alleging that the deeds were in her name, but she was the owner of only a half interest, and plaintiff was the owner of

one half.  On October 5, 1926, plaintiff filed a petition of intervention in the partition suit, setting up his claim to a one-half interest, and on November 22, 1926, filed a substituted petition of intervention, setting up his claims at greater length.

A guardian was appointed for Frank Padgett (as is claimed, on his own application), though he (Frank) was called as a witness by plaintiff, and gave testimony, without objection to his competency.  He testified, in substance, that he didn't think that he heard plaintiff make the claim that he owned one half the property; that: "Q. They told you what they wanted you to sign was a paper that Sherman claimed his wages, and would be settled out of court,—that is what they told you? A. Yes. * * * I said, 'He ought to be paid.' "  The guardian, on January 17, 1927, answered plaintiff's substituted petition of intervention, taking issue on its allegations.  The same date, the defendants Nathan H. Padgett, Jennie Barber, and Sarah Caldwell in like manner answered the substituted petition of intervention, and, with Mary Coomes Hull and William H. Padgett and the guardian, filed cross-petition.  On April 18, 1927, the partition suit was consolidated with the plaintiff's substituted claim and petition in equity in the administration proceedings.  On April 29, 1927, defendant James E. Padgett answered, admitting all of plaintiff's substituted claim and petition and all of his reply.  Many other pleadings were filed, consideration of which would throw no further light upon the questions to be here determined.

The indicia of the relationship are those of coproprietors since 1892.  Plaintiff in 1893 was of the ambitious age.  He manifestly had ability.  Decedent was, by reason of her sex, not adapted to the physical outside work of the farm.  There is no showing that she had managerial ability.  Undoubtedly, plaintiff and decedent entertained high regard for each other.  If plaintiff had been only a servant, there would be some evidence of his expectancy and receipt of wages.  Plaintiff's interest was clearly not in the time that he put in, or in compensation he was to receive for his time, but in the success of the farming operations and in the development, enlarging, and improving of the property.  It is incredible that he should spend more than 30 of his best years on the same farm as a hired man for a single employer, wholly indifferent to compensation, and with an eye to building up and accumulating an estate for the employer.  It is

extraordinary for a hired man, but usual for a proprietor, to have the entire management of farming operations, to conduct it according to his own judgment, to rent and purchase land, sign notes for the price of land purchased, draw checks at his own discretion, payable to himself, checks for building material, implements, labor, farming and household expenditures, plan improvements, purchase material, employ labor, pay the house bills and incidental expenses, conduct all the outside operations, assist in making out tax returns, sign some of them himself, work early and late, without regard to hours, obtain the reputation of being the best, or one of the best, farmers in the neighborhood,—in short, everything that an industrious and modern proprietor is, and for more than 30 years,—without any acquisition for himself, leaving his employer to do the ordinary work of a farm wife.

Some question is raised whether the evidence shows an agreement to share profits and losses. We think undeniably there was a sharing of profits and losses, and in any event, there was, for all practical purposes, a partnership; though the exact technical legal relationship (except that plaintiff alleges a co-partnership) would not be controlling.

The conclusion that plaintiff and decedent, on his return after quitting in 1892, became partners in their farming operations, is irresistible. The court denied plaintiff any right to the 22 acres which decedent then owned. The subsequent purchases were made with partnership funds. To them the statute of frauds has no application. By the taking of title in the name of decedent, a trust resulted in favor of the partnership. *Lutz v. Billick,* 172 Iowa 543; 27 Corpus Juris 220 *et seq.* Besides, there was part performance.

Defendants insist that, by filing claim against the estate, plaintiff made an election of remedies. An election is a choice of remedies. One who has not the choice may not elect. If  there was a partnership, the plaintiff had no choice. If he was a partner, he could not recover wages without the assent of the defendants. The claim was filed in the endeavor to obtain a settlement. The effort was abortive. Plaintiff had no remedy by way of recovery of wages. His fruitless effort to settle, and his filing of a claim to that end, were a resort to a remedy which did not exist,

and did not constitute an election. *Asher v. Pegg*, 146 Iowa 541; *Courtney v. Courtney*, 149 Iowa 645; *Gardner v. Gauthier* (Vt.), 141 Atl. 682; *Bierce v. Hutchins*, 205 U. S. 340; *Schenck v. State Line Tel. Co.*, 238 N. Y. 308 (144 N. E. 592); *Frederickson v. Nye*, 110 Ohio St. 459 (144 N. E. 299); 9 Ruling Case Law 956 *et seq.*; 20 Corpus Juris 21. Furthermore, the plaintiff was laboring under the belief that he had no remedy; that he could not prove the partnership. He did not make voluntary choice between filing claim for wages and demanding his interest as a partner, nor did he follow his claim for wages. Defendants rejected the claim for wages; were not prejudiced. There is no estoppel, and no election. 20 Corpus Juris 21 *et seq.*, 25, 26, 37.

Defendants argue that plaintiff is barred by laches. The relationship of the parties existed without question or denial, and was active and mutually recognized up to the moment of decedent's death. No occasion for action on plaintiff's part prior to that time arose. There were then no unreasonable delay, and no negligence, no disadvantage to defendants, who merely stepped into the decedent's shoes, no staleness, no laches. 4 Pomeroy's Equity Jurisprudence (4th Ed.) 3416, Section 1442; 21 Corpus Juris 210.

Plaintiff moves to dismiss the appeal because the issues in the first partition suit were adjudicated in this cause, and no notice of appeal in that was served. That cause was consolidated with this. But one decree was rendered. The appeal is from that decree. The motion is without merit.

Plaintiff moves to strike the abstract because of its unnecessary length, of 803 pages, and because it is practically a transcript. We are not disposed, on this record, to thus summarily dispose of the case. The motion is overruled.—*Affirmed.*

ALBERT, C. J., and EVANS, FAVILLE, DE GRAFF, and KINDIG, JJ., concur.

STEVENS, J., dissents.

WAGNER, J., not participating.