FLOYD G. TODD, individually and as trustee, et al., appellants, v. MARION TODD et al., appellees.

No. 49527.

(Reported in 96 N.W.2d 436)

MAY 5, 1959.

REHEARING DENIED JULY 24, 1959.

Everett G. Scott, of West Union, for appellants.

Larson & Carr, of Charles City, and John R. Cronin, of Nashua, for appellees.

PETERSON, J.—Because a rehearing was granted, the former opinion herein, reported in 92 N.W.2d 415, is withdrawn, and the following substituted therefor.

The case is an action in equity for partition of 670 acres of land in Floyd County, together with all personal property on the farms.

The partnership of Todd Bros. was established for farming purposes in 1920, after the death of the father of Floyd, Thomas, Harry and Elmer. It has continued to this date. The senior Mr. Todd left 350 acres to the four sons. Since his death the partnership has purchased 320 additional acres, which includes the 100 acres involved in this appeal. This tract was purchased in 1929 from partnership funds and deed was executed by Mr. and Mrs. Huntley to the four Todd Bros. as owners in common.

Elmer died in 1937, leaving neither a widow nor issue. Harry died testate in 1951, leaving all his property to his three daughters, subject to life estate in his widow.

The only controversy is the matter of ownership of the 100-acre tract. Appellants contend it is owned by the partnership of Todd Bros., and therefore is two thirds the property of appellants, and one third the property of the three children and widow of Harry Todd, deceased. The Harry Todd family claim absolute ownership because Harry held the naked title at his death. The trial court established ownership in the three daughters of Harry Todd, subject to life estate in his widow. Plaintiffs have appealed.

Harry G. Todd, one of the partners, applied for a homestead tax credit on the land in 1937. An assessor erroneously told him no such credit could be allowed because he owned only a fourth interest. Upon an attorney's advice the other three brothers placed the legal title in Harry's name.

Actually the deed was entirely unnecessary. Under the homestead credit law as construed in Eysink v. Board of Supervisors of Jasper County, 229 Iowa 1240, 296 N.W. 376, the exemption was as fully allowable before the deed was made as it was afterwards. Neither the state nor anyone else was defrauded by the transfer of title. Had there been any fraud or deception Harry would have been as much a party to it as the grantors in the deed.

When the attorney prepared the deed from the three brothers to Harry for the homestead tax purpose, he also had Harry sign three blank deeds to be used for reconveyance if the occasion should arise. W. H. Scott, the attorney who prepared the deed, testified:

"Q. Now, at the time that deed was executed, state, if you know, whether there was any oral agreement between the four brothers whose names appear on the deed pertinent to the same transaction? A. There was.

"Q. And what was that agreement? A. The agreement was they were to maintain this arrangement, carry the legal title in one of the partner's name, Harry Todd, so long as it became necessary to get that homestead tax exemption for the partnership.

"Q. Now, in connection with this transaction about which you are testifying, were there any other papers signed or executed? * * * A. The arrangement was if the three brothers or grantors would convey the legal title to Harry, that he in turn would execute a deed to convey back to them the same title if necessary.

"Q. And were any papers signed at that time for that purpose? * * * A. There were three blank deeds signed by Harry G. Todd. * * * and it was for the purpose of completing the oral agreement that the brothers made in regard to holding the legal title to this land in Harry G. Todd. I might add the deeds were left in my presence by the brothers with instructions for me to fill out the names and descriptions if it became necessary at some future date. * * * They were in the files in my office continuously since they were signed."

As frequently happens under like circumstances it did not occur to the remaining partners to demand a reconveyance of the legal title to this land which was bought, paid for, maintained and operated at all times by the partnership. Doubtless it did not occur to them that because the legal title had been permitted to remain in one of the brothers a court of equity would some day hold they had no interest in it.

The record in the case contains the following evidence in support of appellants' position, without *any contradictory evidence* and without any dispute as to the facts.

1. When the 100 acres were purchased in 1929 the purchase price was paid from partnership funds.

2. At all times, both before and after it was deeded to Harry, it was operated as a part of Todd Bros. farming operations.

3. When deeded to Harry no consideration was paid by him to his brothers.

4. All farm income from the 100 acres was paid to Todd Bros. and all farm expenses were paid by them.

5. After the property was deeded to Harry, major improvements were made to the buildings, the cost of which was paid from Todd Bros. funds.

6. Floyd Todd was the partner who took care of tax matters. After 1937 the assessment rolls on the 100 acres continued

to be signed "Todd Bros. by F. G. Todd" with a notation that the 100 acres were assessed in the name of Harry Todd.

7. From 1929 to 1956, when this case was started, the receipts and expenses in connection with the 100 acres were included in Todd Bros. partnership income tax return.

8. Harry lived in the house on the farm with his family until his death. His family remained there for three years after his death. Mrs. Todd and her three daughters then moved to the town of Nashua into a house purchased by partnership funds. The house on the 100-acre tract was then used for one year by a hired man of Todd Bros. Since they no longer needed this married hired man they rented the house for $20 a month, which money was paid into the Todd Bros. partnership account.

9. From 1937 until the commencement of this action no individual ownership was ever claimed by Harry, nor by his wife and three daughters after his death.

10. In the inventory and final report in the Harry Todd estate only a one-third interest in the 100 acres was listed as a part of the assets of his estate. The widow and daughters were cognizant of this fact and the widow signed the necessary papers for the closing of the estate.

11. After the closing of the Harry Todd estate the widow joined in the appointment of Floyd Todd as trustee for the family for the purpose of continuation of Todd Bros. operation as a partnership, which trusteeship included the 100 acres.

12. Under his will Harry Todd left his one-third interest in the Todd Bros. land and personal property to his three daughters, subject to life estate in his widow. She filed acceptance of the terms of the will. For over five years, after the death of Harry Todd, she secured her one-third interest in the profits of Todd Bros. including the operation of the 100 acres. In the final report in the Harry Todd estate, approved by Marion Todd, the widow, appears the following statement: "That it is the desire of the surviving widow, Marion Todd, to continue as a partner with Thomas C. Todd and Floyd Todd in the operation of the Todd Bros. partnership, and as provided for in the will of said decedent, and in which the above described property, real and personal, constitutes a one-third interest." (This included the 100-acre tract.)

13. In the order of court approving the final report in the estate of Harry Todd, deceased, which final report was approved by the widow for herself and as natural guardian of her three children, appears the following statement: "That Floyd Todd is hereby appointed as trustee to manage and administer the *real and personal property of said estate as described in the final report of said executor,* and to carry out all of the provisions of the will of said decedent during the lifetime of the surviving widow." (Emphasis ours.) (The property described in the final report included a one-third interest in the 100-acre tract.)

14. The above agreement by Marion Todd was all in accordance with a specific provision in the will of Harry Todd, deceased, providing as follows: " 'I hereby direct that all of my said property shall be used and operated as it has been during my lifetime, that is, in one unit, and under the name of Todd Brothers, and in conjunction with the property of my surviving brothers or any of them.' "

15. After 1920 when the sons became the owners of the real estate by inheritance from their father, and thereafter when more land was purchased, the bank accounts were always maintained in the name of "Todd Bros." both at the Nashua Bank and the Charles City Bank. None of the partners maintained a separate account. All receipts were deposited in the partnership account. All expenses, including the personal expenses of each family, were paid by checks on the partnership account. This procedure was continued after Harry's death except that thereafter each year one third of the net profits of Todd Bros. was paid from the partnership account to Marion Todd, Harry's widow. This included all receipts and all expenditures as to the 100-acre tract.

16. Harry Todd's widow, to whom there was devised a life estate in his property, testified she had no knowledge of the 1937 deed to her husband until 1956. It seems scarcely conceivable that if Harry claimed to be the real owner of this farm, his wife would not know of the deed until four years and four months after his death.

17. There is no fair room for a finding these brothers intended to make a gift of the farm to Harry. The only reason-

able conclusion is that they all, including Harry, intended it to remain as partnership property. Defendants' rights rise no higher than Harry's.

We have held in numerous cases that where real estate is purchased from partnership funds, and the receipts and expenses maintained through partnership funds, even though the title is taken in the name of one partner, the real estate is the property of the partnership. York v. Clemens, 41 Iowa 95; Paige v. Paige, 71 Iowa 318, 32 N.W. 360, 60 Am. Rep. 799; Amidon v. Snouffer, 139 Iowa 159, 117 N.W. 44; In re Estate of Mahin, 161 Iowa 459, 143 N.W. 420; Lutz v. Billick, 172 Iowa 543, 154 N.W. 884; Smith v. Smith, 179 Iowa 1365, 160 N.W. 756; Sinclair v. Allender, 238 Iowa 212, 26 N.W.2d 320; Wellman v. Wellman, 206 Iowa 445, 220 N.W. 82. The general principle also appears in 40 Am. Jur., Partnership, section 103, and 68 C. J. S., Partnership, section 74. See also Shanahan v. Olmsted County Bank & Trust Co., 217 Minn. 454, 14 N.W.2d 433.

Smith v. Smith, supra, was an action involving the property of a partnership composed of two brothers, J. R. Smith and W. C. Smith. It extended over a period of twenty-seven years. Many real-estate transactions transpired during the period and the title to several pieces of real estate purchased with partnership funds was taken in the name of the individual partners. As a general principle the court stated in the case at page 1374 of 179 Iowa, page 759 of 160 N.W.:

"On the contrary, the courts uniformly declare that whether real estate purchases with partnership funds shall be treated as partnership property depends on the intention of the partners, and whenever this can be ascertained, that intention will be given effect. * * * Such intention may be manifested by surrounding circumstances, the situation of the parties, the manner of keeping the accounts, how repairs, improvements and taxes have been paid, and what has been done with the income —the use made thereof, and the like."

By this test the position of appellants in the case at bar is completely sustained.

The court used the following language in the above cited case (page 1376 of 179 Iowa) with reference to one tract of land purchased in the name of one of the partners: "This land

was retained 13 years. It was improved from the firm funds and taxes and interest paid therefrom, and rents and profits deposited therein. It was treated precisely as if it were partnership property, like other property claimed by W. C. to belong to the partnership, and no charges to W. C. made nor credits given him; and we are of opinion, for the reasons hereinafter stated, that, notwithstanding the fact that title was taken in the name of W. C., it should be regarded as belonging to the firm."

In Wellman v. Wellman, supra, at page 451 of 206 Iowa, page 85 of 220 N.W., this court stated: "Competent proof of an express trust was not necessary, in this case. The rule is well settled that, where a conveyance of real property is made without consideration, and it appears from the circumstances that the grantee was not intended to take beneficially, or where the grantee accepts the conveyance from the grantor, knowing that it was not part of his intention to bestow a gift or to confer a benefit upon him, * * * a constructive trust arises, and the grantee will be deemed to hold the title in trust for the benefit of the beneficiaries intended. * * *." (Citations)

In Shanahan v. Olmsted County Bank & Trust Co., supra, the question involved was the ownership of certificates of deposit and title to a farm, paid for from partnership funds, but taken in the name of one partner and so remained for a considerable period. The court holds (page 458 of 217 Minn., page 435 of 14 N.W.2d): "There can be no presumption that by putting money in the form of certificates of deposit there was any intention to change the ownership of the partnership property. The same with respect to the home farm. * * * The burden of proof was on J. W. [titleholder] or his representative to show that the purchase price of the home farm was not paid out of partnership funds."

The principle is well recognized in many jurisdictions as shown by the following quotations from Am. Jur. and C. J. S., both supra.

40 Am. Jur., Partnership, section 103, page 200: "Real estate acquired by partners, in a partnership business and for its purposes, constitutes partnership assets, although the legal title is taken in the name of one of the partners."

■ 68 C. J. S., Partnership, section 74, page 514: "Where real property is shown to have been purchased with partnership funds, the property is presumed to be partnership property, even though the title is in the name of an individual partner. * * * where the property is shown to have been purchased with partnership funds, the burden of proving that it is not partnership property is on him who so alleges."

■ Appellees urged that the general Statute of Limitations, section 614.1, and the Special Statute of Limitations, section 614.17, are effective against appellants. The Statutes of Limitations would not apply to this case as the record shows that from the time this Huntley farm was purchased up until the time of trial it was farmed by the four brothers and in possession of the partnership, until the deaths of Elmer and Harry, and by appellants since Harry's death.

■ Appellees also urge section 557.10, Statute of Frauds, is effective to nullify appellants' position. Where the title to partnership property is taken in the name of one of the partners and the facts are such that a resulting trust is established, section 557.10 is not effective. The partnership ownership can be established by parol evidence. Paige v. Paige and Amidon v. Snouffer, both supra; Hull v. Padgett, 207 Iowa 430, 223 N.W. 154; In re Estate of Mahin, supra.

In Paige v. Paige, supra (page 325 of 71 Iowa), the court said: "In such case the trust is not an express one, but is implied, or results from the operation or construction of the law, and is within the exception named in section 1934 of the Code [now section 557.10], and such a trust may be shown by parol evidence."

In Hull v. Padgett, supra (page 446 of 207 Iowa), the court said: "The subsequent purchases were made with partnership funds. To them the statute of frauds [Code of 1927, section 11285; now section 622.32] has no application. By the taking of title in the name of decedent, a trust resulted in favor of the partnership."

The only evidence offered by appellees to support their contention as to absolute ownership of the 100-acre tract consisted of two matters.

One was a desultory conversation which the witness testified he had with Harry prior to his death. The witness was a neighbor who was driving some cattle along the road to pasture. The neighbor, Fred Schroeder, testified: "I was on my place and he was on his, his across the road on the Todd Brothers 80, and I had to drive my cattle about a mile to pasture, and he knew it, and he said 'Fred, I am trying to get the boys so I get this 80 to go with mine, and then I will rent you a pasture and you won't have to drive them around the road.'"

The other evidence was the fact that Mr. Scott, the attorney for the estate of Elmer Todd, who died shortly after the deeding of the 100-acre tract to Harry, did not include Elmer's undivided one-fourth interest in the 100 acres in the inventory in the estate. Mr. Scott testified: "The only explanation I have for that is that it was simply an oversight on my part in not including it. * * * I know that at the time of Elmer Todd's death he did own an interest in the 100 acres."

As to the conversation with the neighbor we could reasonably say it was a manner of speaking on the part of Harry. His home and place of residence was on the 100-acre tract and for that reason he referred to it as "mine" without any legal significance.

As opposed to the overwhelming testimony as to partnership ownership, as heretofore outlined, these two isolated incidents are not controlling as to establishment of absolute ownership in appellees.

The decree and judgment of the trial court is reversed as to ownership of the 100 acres described as "North ⅝ths of Southwest ¼ of Section 21, Township 94 North, Range 15, West of the Fifth P. M., in Floyd County", with instructions that supplemental decree be entered establishing the ownership one third in Floyd G. Todd, one third in Thomas C. Todd, and one ninth each in Laura Todd Schroeder, Dorothy Todd and Elizabeth Todd Bigelow, subject to life estate in Marion Todd Reints as to proceeds of sale of one third of 100 acres.—Reversed.

THOMPSON, C. J., and OLIVER, BLISS and GARFIELD, JJ., concur.

GARRETT, LARSON, THORNTON, and HAYS, JJ., dissent.

GARRETT, J. (dissenting)—I am unable to agree with the majority and therefore respectfully dissent. The majority opinion, as I view it, overrides some well-established principles of law and ignores some facts which should be controlling. No one disputes the maxim that "he who comes into equity must come with clean hands." The trial court correctly found appellants did not bring themselves within this rule. The record amply sustains the following statement of the learned trial court in his findings of fact: "Much of the evidence offered by the plaintiffs in support of their claims is not sufficiently credible to be worthy of belief. It is replete with inconsistencies. It acknowledges that the deed in question was the result of a deception and deceit to secure a tax advantage which the state of Iowa was not then granting. It acknowledges that the state of Iowa was deprived of inheritance taxes twice by the deed in question if the plaintiffs' claims were sustained."

The majority urge that the deed to Harry G. Todd was unnecessary to accomplish the desired tax relief in view of the law, but that does not alter the fact that, if appellants' present position is correct, they were seeking to circumvent what they thought was the law. They were implementing their purpose and desire to defeat the state whether they accomplished it or not. With reference to the failure and refusal of Thomas Todd as executor of Elmer Todd's estate to report for tax liability and pay the tax due, if appellants' position is correct the following quotation from Sisson v. Janssen, 244 Iowa 123, 131, 56 N.W.2d 30, 34, is in point:

"It is argued on behalf of plaintiff that the 'clean hands' doctrine is inapplicable here for various reasons: e.g., that the claimed oral agreement was neither illegal nor malum in se because the defendant failed to show any express statute or racing association rule which forbade such a transaction as defendant claims this was. * * * It is clear that a transaction of the sort claimed by plaintiff would be against public policy and immoral. Equity cannot be a party to it. We know of no case that holds the maxim merely condemns acts violative of statute and acts malum in se. We think it means 'that equity refuses to lend

its aid in any manner to one seeking its active interposition, who has been guilty of unlawful or inequitable conduct in the matter with relation to which he seeks relief', and that 'the maxim is based on conscience and good faith.'" 30 C. J. S., Equity, section 93, pages 476, 477.

The admitted conduct of appellants and their attorney, W. H. Scott, is difficult to reconcile with any theory other than that they considered the conveyance to Harry of the 100-acre Huntley farm as an absolute conveyance in fee simple or if they did not so consider it then they chose to make it so appear for fraudulent purposes. The only excuse they offer for affirmatively excluding this farm from Elmer's estate is that Attorney Scott overlooked it. It must be said of Thomas and Floyd Todd that they are businessmen of more than ordinary ability and acumen as evidenced by their accumulation of property, buying, with their brothers one farm after another with a full complement of stock and equipment. It is believable the omission from the inventory might be excused but the repeated and continued exclusion of this land in the further administration of Elmer's estate, the closing of the estate without paying the inheritance tax and the failure ever to pay the inheritance tax cannot be accepted as oversight on the part of these two brothers and their fully informed legal adviser. If this record against the appellants is to be excused as an oversight then this case will be a precedent for excusing as an oversight almost any conduct a litigant wishes to have excused. For the many months it took to administer Elmer's estate, Floyd and Thomas and their attorney conducted themselves in all respects, even to the filing of many verified documents to that general effect, as though the deed to Harry was just what, on its face, it purports to be.

The majority opinion refers to three blank deeds executed by Harry and left with Mr. Scott who testified: "Regarding Exhibit I [three blank deeds] there were three parties that conveyed legal title in trust to Harry Todd. This is the only significance I can think of as to why there were three blank deeds. One was made for the benefit of each. I presume Harry could have reconveyed the 100 acres in one deed had he wanted to."

This is rather vague and indefinite testimony, coming from one so eager to sustain his clients' cause. He gave other testi-

mony, mostly incompetent, but the chain of his testimony can be no stronger than the weakest link and there were several weak links in addition to his intense interest.

The attorney for the executors was the same W. H. Scott who had drawn the deed to the 100 acres to Harry G. Todd, and who was attorney not only for the "Todd Brothers" partnership but for the individual members thereof and for the Elmer Todd estate and the Harry G. Todd estate. Harry's widow, Marion Todd (now Marion Todd Reints) testified she relied upon the advice of the attorney, W. H. Scott, and acquiesced in all the suggestions made by him and upon his advice and recommendations, and that "Floyd after his appointment [as trustee] never conferred with me or the girls in regard to the administration of the property. We never received a report. * * * I never requested this information from Floyd. I never felt very free to talk to Floyd about the business. * * * I went along with whatever they did."

Floyd rented an apartment in town for her and her three daughters and later bought a house without consulting her.

The majority seek to make capital of the fact that Marion Todd signed whatever she was asked to sign and whatever Attorney W. H. Scott prepared for her signature, and that she did not know of the deed to Harry until after his death. It is so plain in the record here "that he who runs may read" that Marion and her daughters were never consulted or kept informed on anything relating to their business interests and the interests of the Todd Brothers until this suit was commenced.

It is most obvious that at all times Floyd and Thomas and their attorney maintained a confidential relationship between themselves and appellees in which appellants were the dominant persons and the appellees the subservient ones. They now seek to benefit by their dominant position and the advantage they gained by instructing appellees what to sign.

It seems most significant that appellants have never been able to explain why they conveyed the entire 100-acre farm to Harry in order to secure the 40-acre homestead tax deduction. The fact he was the only one who had direct heirs would be reason enough for this conveyance. It is equally difficult to understand why Harry and Marion were never asked to recon-

vey this tract if what appellants now claim is true. Harry was very ill for several years but they chose to wait until he could not speak.

The majority minimize the effect of the only vital testimony coming from a disinterested party. A neighbor of Harry's testified:

"A. I was on my place and he [Harry] was on his, his across the road on the Todd Brothers 80, and I had to drive my cattle about a mile to pasture, and he knew it, and he said 'Fred, I am trying to get the boys so I get this 80 to go with *mine*, and then I will rent you a pasture and you won't have to drive them around the road.' Q. He referred to his place as mine, did he at that time? A. That is right. He said 'I will try to get that with mine.' That 80, the north 80 of the Todd Brothers at that time. Then he was going to rent me the pasture and I wouldn't have to drive them around."

This is clear, positive, undisputed testimony and shows most clearly and convincingly that Harry considered this land as his.

It is most difficult to understand how the majority can accept as satisfactory, clear and convincing evidence the shifting positions of appellants. If they could not make up their own minds how are we to do it for them? In their original petition they allege that the ownership of the entire 670 acres and all of the personal property was in thirds. In their Second Amendment they allege their interest in the north 160 acres to be two thirds, three fourths in the South 410 acres, and two thirds in the 100 acres. In this same amendment they claim two thirds of the personal property, alleging one fourth as belonging to appellees and that the remaining interest belonged jointly to all of the parties. In their Third Amendment they changed their claim of ownership in the 100 acres from two thirds to three fourths. In their Fourth Amendment they admitted legal title to the 100 acres to be in Harry G. Todd and for the first time alleged that he held title in trust and that the appellees were entitled to only one fourth of the 100 acres.

The question confronting us is whether or not the deed of December 30, 1937, created a resulting or constructive trust in favor of the grantors, Elmer, Thomas and Floyd G. Todd. No

resulting trust arises in favor of the transferor where he transfers his own property without consideration to another. This court has so held in the recent case of Shaw v. Addison, 239 Iowa 377, 389, 390, 28 N.W.2d 816, 823, where the court said:

"But the rule that a prima-facie case of resulting trust is established by showing the consideration moved from the claimant has no application with respect to these transfers for two reasons. In the first place, in both instances the decedent transferred his own property. The rule only has application in the purchase of property where the title moves direct from the seller to one who does not furnish the consideration. There is no rule of law that creates a presumption of resulting trust in transferor's favor when he transfers his own property to another without consideration. The rule is thus stated in Restatement of the Law of Trusts, section 405:

'Where the owner of property transfers it without declaring any trust, the transferee does not hold the property upon a resulting trust although the transfer is gratuitous.

'* * * Where a transfer of property is made without consideration, the inference is that the transferor intends to make a gift to the transferee, not that he intends that the transferee should hold the property for the benefit of the transferor. This is true even though it appears in the instrument of conveyance that no consideration is paid for the conveyance.' "

Before appellants are entitled to prevail in this case they should show by competent, admissible evidence that an express trust was created at the time of the execution of the deed. The degree of proof required to establish an express trust has been many times clearly stated by this court. Sinclair v. Allender, 238 Iowa 212, 223, 26 N.W.2d 320, 327, states the rule as follows: " 'One of the parties to the transaction being dead, the proof should be clear, unequivocal and without doubt and uncertainty.' "

Appellants have fallen far short of meeting this burden. I would affirm.

LARSON, HAYS and THORNTON, JJ., join in the dissent.